OPINION
{¶ 1} Appellant Russell Hubert Huff, II, was convicted by jury in the Stark County Common Pleas case of one count each of Involuntary Manslaughter, in violation of R.C. 2903.04, and Aggravated Assault, in violation of R.C. 2903.12, with a Firearm Specification, R.C. 2941.145. The trial court sentenced Huff to seven years for Involuntary Manslaughter, and three years on the Firearm Specification, to be served consecutively.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On November 24, 2005, Thanksgiving Day, Huff shot and killed his 27-year-old son, Russell Huff III (known as JR), in the home they shared in Canton, Ohio.
 {¶ 3} According to the testimony at trial, Huff and his son had a history of drug abuse, alcohol abuse and domestic violence. In the past, JR had threatened to kill his father on several occasions.
 {¶ 4} Huff and JR lived together on Endrow Avenue and planned to spend Thanksgiving together. Huff is 50 years old and on that day he awoke at 3:00 am, did some household chores and went to his ex-wife's house to work on her car. He returned home at approximately 1:45 pm. He then took JR to get some vodka and orange juice. The two sat and watched football on television. Around 3:00 pm, Kimberlie Neighbors came over. Ms. Neighbors is a teenager who was involved in a turbulent relationship with JR. On this day, Ms. Neighbors and JR argued for some time, and thereafter Ms. Neighbors asked Huff to take her to the grocery store to buy aluminum foil. Huff did so and then returned home after dropping off Ms. Neighbors at her house. *Page 3 
 {¶ 5} However, Ms. Neighbors continually called JR from her house. The conversations were a continuation of the earlier argument. At least, ten phone calls were exchanged.
 {¶ 6} Ms. Neighbors then returned to the Huff residence at approximately 5:00 pm. She observed JR drinking vodka and orange juice and crying. JR appeared to be intoxicated and stated that if he could find the gun he would shoot himself because he did not want to be around anymore.
 {¶ 7} At approximately 6:00 pm, Betty Huff, Huff's ex-wife and JR's mother, arrived at the house with her friend Sophie Fugate and a two-year-old child. JR, Ms. Neighbors and Ms. Fugate went to JR's bedroom to smoke away from the child while Ms. Huff talked with her ex-husband. Ms. Huff then went to the bedroom to smoke. Ms. Huff asked JR why he did not make Thanksgiving dinner. JR became enraged and yelled obscenities at his mother. Ms. Huff quickly left with Ms. Fugate and the child as JR followed them from the house continuing his tirade. Huff did not want them to leave and stated: "[p]lease don't leave, please don't leave. See what I have to deal with". T. at 490.
 {¶ 8} Ms. Huff drove away and she had Ms. Fugate call the house after traveling only about a block from the house. Ms. Fugate testified that JR said: "[t]ell mom to come get me. Dad is shooting at me". Ms. Fugate handed the phone to Ms. Huff. JR stated to his mother: "I'm going to kill him". Something she had heard JR state on prior occasions. Ms. Huff told Ms. Fugate to dial 9-1-1.
 {¶ 9} The testimony further established that after Ms. Huff left, JR and his father started arguing. Huff told JR to leave the house and pushed him out of the front door. *Page 4 
JR and his father began punching each other. JR said he was going to kill his father. JR and Huff broke through the porch lattice railing and JR began choking his father. At some point, JR stopped choking his father and got off him.
 {¶ 10} Huff re-entered the house and closed the front door but JR forced his way back into the house. Huff continued yelling at JR to get out. JR refused to leave until he could get his "stuff." Huff went to his bedroom. Ms. Neighbors heard a "pop" sound from Huff's bedroom. At that point, JR was speaking to Ms. Fugate and his mother on the phone. After hanging up, JR threw the phone and it broke into pieces. JR went to his bedroom and retrieved some clothing. JR and his father continued to yell at each other. JR walked toward Huff's bedroom and struck the clock on the wall by the bedroom.
 {¶ 11} Huff came out of the bedroom and shot his son in the chest with the .22 caliber rifle he kept under the mattress in his bedroom. The bullet struck JR in the chest. Ms. Neighbors began screaming and put a pillow under JR's head.
 {¶ 12} Huff called 9-1-1. Canton Police Officer Terry Monter arrived at the house at 6:54 pm. Officer Monter believed he was responding to a domestic violence call and was updated that there may also be a possible heart attack at the residence. When he arrived, Huff motioned him to come in. Huff stated: "He's been shot." T. at 180. The officer mistakenly believed JR had a self-inflicted head wound. Huff told Officer Monter that he shot JR in the chest. The officer and Huff performed CPR on JR.
 {¶ 13} The officer observed the .22 caliber rifle lying on a dresser in a bedroom and shell casings on the floor. Ms. Neighbors was crying near JR's bedroom. Huff was *Page 5 
upset and crying and complaining of chest pains. Once another officer arrived, Officer Monter secured the gun.
 {¶ 14} The officers observed bullet holes in the hall entryway and on the left side of Huff's bedroom door frame.
 {¶ 15} JR was transported to Aultman Hospital where he was pronounced dead.
 {¶ 16} Canton Police Department conducted an investigation. Evidence was collected at the home including four spent shell casings and one live round in the chamber of the rifle. The rifle was tested at the Stark County Crime Lab.
 {¶ 17} Huff was interviewed by a detective on the evening of the shooting after treatment at a hospital. He had no visible injuries as a result of the earlier altercation with JR.
 {¶ 18} On January 3, 2006, Huff was indicted by the Stark County Grand Jury on one count of Murder, R.C. § 2903.02(B), and one count of Felonious Assault, R.C. § 2903.11(A)(2), with a Firearm Specification.
 {¶ 19} Huff signed a time waiver and pled not guilty.
 {¶ 20} On February 27, 2006, the case proceeded to trial. The State called eight witnesses. Huff called one witness and testified on his own behalf. Huff testified he went into his bedroom and retrieved the rifle after JR forced his way back into the house. Huff fired three warning shots when he heard JR saying: "I'm going to kill him". T. at 522. Thereafter, Huff stepped to the doorway of his bedroom. He saw JR coming down the hallway and stated he fired when JR would not stop coming at him.
 {¶ 21} The jury was instructed on the elements of murder as well as the lesser-included offense of involuntary manslaughter. *Page 6 
 {¶ 22} The jury was also given the following instruction of self-defense:
 {¶ 23} "The Defendant is also asserting the affirmative defense of self-defense. To establish the defense of self-defense, the Defendant must prove by a preponderance of the evidence that (A) he was not at fault in creating the situation giving rise to the altercation; and, (B) he had reasonable ground to believe and an honest belief that he was in imminent danger of death or great bodily harm, and that his only means of escape from such danger was by use of deadly force." T. at 634.
 {¶ 24} On March 2, 2006, the jury convicted Huff of the lesser-included offense of Involuntary Manslaughter and Aggravated Assault with a Firearm Specification.
 {¶ 25} On March 3, 2006, the trial court sentenced Huff to a total of ten years in prison.
 {¶ 26} Huff timely appealed raising the following assignments of error:
 ASSIGNMENTS OF ERROR {¶ 27} "I. THE JURY RECEIVED AN ERRONOUS [SIC] AND MISLEADING INSTRUCTION ON SELF-DEFENSE, RESULTING IN PLAIN ERROR, AND DENIED APPELLANT HIS RIGHT TO A FAIR T RIAL.
 {¶ 28} "II. THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE RECORD DEMONSTRATES THAT HE ACTED IN SELF DEFENSE.
 {¶ 29} "III. APPELLANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL." *Page 7 
 I. {¶ 30} In his first assignment of error, Huff maintains the trial court erred when it gave a misleading instruction on self-defense.
 {¶ 31} We begin our analysis of this assignment of error by first noting that defense counsel did not object to the self-defense instruction as given. Crim.R. 30(A) addresses the giving or failure to give a jury instruction. This Rule provides in pertinent part:
 {¶ 32} "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury."
 {¶ 33} Because defense counsel did not object pursuant to Crim.R. 30(A), we must review this matter under a plain error analysis. Crim.R. 52(B) provides: "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."
 {¶ 34} "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978),53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 35} In order to find plain error under Crim.R. 52(B), it must be determined, but for the error, the outcome of the trial clearly would have been otherwise. Id. at paragraph two of the syllabus.
 {¶ 36} Generally, a party is entitled to the inclusion of requested jury instructions in the court's charge to the jury "`if they are a correct statement of the law applicable to *Page 8 
the facts in the case * * *.' "Murphy v. Carrollton Mfg. Co. (1991),61 Ohio St.3d 585, 591, quoting Markus Palmer, Trial Handbook for OhioLawyers (3 Ed.1991) 860, Section 36.2. In reviewing a record to decide the presence of sufficient evidence to warrant the giving of a requested instruction, an appellate court should determine whether there is evidence from which reasonable minds might reach the conclusion sought by the instruction. The decision to include a particular jury instruction is a matter within the sound discretion of the trial court. Thus, we will not reverse the trial court's decision absent an abuse of discretion. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 37} The standard instruction on self-defense for cases involving deadly force was set forth in State v. Robbins (1979), 58 Ohio St.2d 74,388 N.E.2d 755 and is contained in 4 Ohio Jury Instruction, Section 411.31:
 {¶ 38} "To establish self-defense a defendant must prove: (A) he was not at fault in creating the situation giving rise to the event; (B) he had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was by use of deadly force; and (C) he had not violated any duty to retreat."
 {¶ 39} In this case, the trial court modified the instruction by removing the duty to retreat:
 {¶ 40} Court: "The Defendant is also asserting the affirmative defense of self-defense. To establish the defense of self-defense, the Defendant must prove by a *Page 9 
preponderance of the evidence that (A) he was not at fault in creating the situation giving rise to the altercation; and, (B) he had reasonable ground to believe and an honest belief that he was in imminent danger of death or great bodily harm, and that his only means of escape from such danger was by use of deadly force." T. of Trial, at 634.
 {¶ 41} Huff argues that there remained an implied duty to retreat in the instruction when it states: "[h]is only means of escape from such danger was by use of deadly force." Id.
 {¶ 42} The State concedes that there is no duty to retreat if a person is assaulted in his home. The State cites several cases upholding the proposition that there is no duty to retreat from one's home. A person's home is his castle; a place where he is entitled to seek refuge.State v. Peacock (1883), 40 Ohio St.3d 333, 334. In State v. Thomas
(1997), 77 Ohio St.3d 323, 673 N.E.2d 1339, the Ohio Supreme Court held that cohabitants have no duty to retreat, stating in the syllabus: "[t]here is not duty to retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with an equal right to be in the home."
 {¶ 43} In this case, Huff and his son were without question co-habitants and Huff did not have a duty to retreat. As such, Huff was entitled to an instruction which indicated he did not have a duty to retreat. We agree that the instruction the trial court gave implicitly applies a duty to retreat when it included in the self-defense instruction the language: "[h]is only means of escape from such danger was by use of deadly force." T. of Trial, at 634. Therefore, the instruction was in error. The question before this Court is whether it was plain error and whether the failure to instruct on self-defense without a duty to retreat affected the outcome of trial. *Page 10 
 {¶ 44} After a review of the entire record, this Court concludes that the outcome of the trial was not affected by the given instruction. It was a jury question as to whether Huff's actions were in self-defense. The jury found Huff guilty of involuntary manslaughter which the jury was instructed upon as follows:
 {¶ 45} Court: "As you consider the charge of murder, you may also consider the lesser-included offense of involuntary manslaughter.
 {¶ 46} "Involuntary manslaughter is defined as causing the death of Russell Huff III as a proximate result of committing the felony of aggravated assault as opposed to felonious assault.
 {¶ 47} "Aggravated assault is defined as knowingly, while under the influence of sudden passion or in a sudden fit of rage, brought on by serious provocation occasioned by the victim reasonably sufficient to incite the Defendant to use deadly force to cause serious physical harm to the victim.
 {¶ 48} "With regard to the lesser included offense of involuntary manslaughter, the Defendant is asserting the affirmative defense of sudden passion or sudden fit of rage which makes aggravated assault a lesser-included offense of felonious assault.
 {¶ 49} "The Defendant is claiming that at the time of the offense he acted while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by Russell Hubert Huff III that was reasonably sufficient to incite the Defendant into using deadly force.
 {¶ 50} "The Defendant is under the influence of sudden passion or in a sudden fit of rage when there is serious provocation occasioned by the victim that is reasonably *Page 11 
sufficient to incite a person into using deadly force and is an act done in the heat of blood without time to reflect or for passions to cool.
 {¶ 51} "For provocation to be reasonably sufficient to bring on sudden passion or sudden fit of rage, you must determine that the provocation was sufficient to arouse the passions of an ordinary person beyond the power of his control.
 {¶ 52} "In determining whether the Defendant was actually under the influence of sudden passion or a sudden fit of rage, you must consider the emotional and mental state of the Defendant and the conditions and circumstances that surrounded him at the time of the act." Tr. of Trial, at 622-624.
 {¶ 53} By convicting Huff of involuntary manslaughter, the jury believed Huff was under "sudden passion" or a "sudden fit of rage" and not in fear for his life at the time of the shooting. Accordingly, the outcome of the trial would not have been changed by a different jury instruction on self-defense. Therefore, the trial court's error was harmless error, not plain error.
 {¶ 54} Accordingly, Huff's first assignment of error is overruled.
 II. {¶ 55} In Huff's second assignment of error, he challenges his conviction as being against the manifest weight of the evidence.
 {¶ 56} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised *Page 12 
only in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, superseded by Constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89,1997-Ohio-355, 684 N.E.2d 668. In effect, the appellate court sits as a "thirteenth juror" and "disagrees with the factfinder's resolution of the conflicting testimony." Thompkins at 387. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N .E.2d 212, syllabus 1. The standard is difficult to meet, as the rule is necessary "to preserve the jury's role with respect to issues surrounding the credibility of witnesses."Thompkins at 389.
 {¶ 57} Upon review of the entire record, this Court is not persuaded that the jury lost their way. The jury heard testimony from Huff and several witnesses, as well as the responding officers. The jury was in a far better position to determine the witnesses' credibility and to reject Huff's claim he shot his son in self-defense. In convicting Huff of involuntary manslaughter, the jury recognized JR's provocation brought on his father's actions. However, the jury determined Huff's actions were the result of sudden passion or rage, and not because of fear of imminent danger of death or great bodily harm. JR did not possess any weapon when he was shot and Huff showed no injuries from the earlier physical altercation with JR on the porch.
 {¶ 58} Accordingly, Huff's second assignment of error is overruled. *Page 13 
 III. {¶ 59} In the third assignment of error, Huff argues he was denied effective assistance of counsel.
 {¶ 60} The standard of review of an ineffective assistance of counsel claim is well established. Pursuant to Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 673, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial court would have been different. State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373.
 {¶ 61} First, we must determine whether counsel's assistance was ineffective, i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his or her essential duties to the client.
 {¶ 62} If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. As stated above, this requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. Id. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v.Sallie (1998), 81 Ohio St.3d 673, 675, 693 N.E.2d 267.
 {¶ 63} Huff first argues his trial counsel failed to object to jury instruction on self-defense and provide the trial court with the correct law. The failure to object is not a per se indicator of ineffective assistance of counsel because counsel may refuse to *Page 14 
object for tactical reasons. State v. Gumm (1995), 73 Ohio St.3d 413,428, 653 N.E.2d 253.
 {¶ 64} Even if this was deficient performance by Huff's trial counsel, this Court has already found in the first assignment of error that a different instruction would not have changed the outcome of the trial.
 {¶ 65} Huff next argues that his counsel was ineffective when he introduced and opened the door on his cocaine usage.
 {¶ 66} There are numerous ways to provide effective assistance of counsel, and debatable trial tactics and strategies do not constitute a denial of that assistance. State v. Clayton (1980), 62 Ohio St.2d 45,49, 402 N.E.2d 1189.
 {¶ 67} Upon review of the record, this Court finds the line of questioning was a tactical decision of trial counsel and certainly within the purview of trial counsel. In addition, the trial court properly instructed the jury that it was to disregard the testimony as there was no evidence that drugs were involved in the case. Thus, this limited testimony, even if error, would not likely affect the outcome of the trial.
 {¶ 68} For these reasons, Huff's third assignment of error is overruled.
 {¶ 69} The decision of the Stark County Court of Common Pleas is affirmed.
 Delaney, J., Hoffman, P.J. concurs separately, Wise, J. concurs. *Page 15