OPINION
{¶ 1} Defendant-appellant, Larese Jones, appeals from a Mahoning County Common Pleas Court judgment convicting him of aggravated trafficking in drugs, aggravated robbery, and murder, following a jury trial.
 {¶ 2} On February 22, 2007, appellant picked up his friend Richard Helms and drove him to David Klamer Jr.'s house on the west side of Youngstown. Appellant was aware that Helms had Oxycontin with him and knew that Helms was going to Klamer Jr.'s house to sell him the drugs. The two men entered Klamer Jr.'s house where Klamer Jr. and his son David Klamer III were present. Appellant sat in a chair in the living room as did Klamer III. Helms and Klamer Jr. engaged in a conversation and the two men made their way into the kitchen.
 {¶ 3} The conversation turned into a gunfight. Both Helms and Klamer Jr. fired shots. When appellant and Klamer III heard the gunfire, they both fled from the house. Appellant uses crutches. He left his crutches behind at the Klamer house. Helms died as a result of a shot fired by Klamer Jr.
 {¶ 4} Klamer III soon went back into the house where he saw Helms lying on the kitchen floor. Klamer Jr. told Klamer III that Helms had attempted to rob him and claimed that he had been shot in one of his fingers. Klamer Jr. told Klamer III that he had taken some pills and was going to overdose. Klamer Jr. also called his friend Emil Sopkovich and told him that he had been robbed and that gunfire had been exchanged.
 {¶ 5} The Youngstown Police investigated Helms's murder. The investigation pointed to appellant because he was a known friend of Helms and appellant's crutches were found in the Klamer residence.
 {¶ 6} Appellant was eventually apprehended in Akron. Detective Sergeant Rick Spotleson interviewed appellant. According to Detective Spotleson, appellant admitted that there was an arranged Oxycontin sale between Helms and Klamer Jr. He also stated that Helms always had a gun on him when he made a drug sale. Appellant first denied that he ever entered Klamer Jr.'s house. Eventually, however, appellant changed his story. He admitted to Detective Spotleson that he too went *Page 2 
into the Klamer residence. And according to Detective Spotleson, appellant admitted that he knew Helms was going to rob Klamer Jr.
 {¶ 7} On March 1, 2007, a Mahoning County grand jury indicted appellant on one count of felony murder, a first-degree felony in violation of R.C. 2903.02(B)(D), one count of aggravated robbery, a first-degree felony in violation of R.C. 2911.01(A)(1)(C), and one count of aggravated trafficking in drugs, a second-degree felony in violation of R.C. 2925.03(A)(1)(C)(1)(d). The murder and aggravated robbery counts contained firearm specifications. A few weeks later, a grand jury issued a superseding indictment that added a fourth count for involuntary manslaughter, a first-degree felony in violation of R.C. 2903.04(A)(C), with an accompanying firearm specification.
 {¶ 8} The matter proceeded to a jury trial where the jury returned guilty verdicts on all counts and specifications. The trial court later sentenced appellant to eight years for aggravated trafficking in drugs, ten years for aggravated robbery, 15 years to life for murder, and three years on the firearm specifications. The court found that murder and involuntary manslaughter merged for purposes of sentencing. The court ordered appellant to serve all sentences consecutive to each other and consecutive to a one-year sentence in another case for a total of 37 years.
 {¶ 9} Appellant filed a timely notice of appeal on November 6, 2007.
 {¶ 10} Appellant raises four assignments of error, the first of which states:
 {¶ 11} "BECAUSE THE INDICTMENT AGAINST LARESE JONES FAILED TO CHARGE ANY MENS REA ELEMENT FOR THE ALLEGED CRIMES OF AGGRAVATED ROBBERY AND MURDER, THE INDICTMENT WAS CONSTITUTIONALLY AND FATALLY DEFECTIVE, RESULTING IN STRUCTURAL ERROR THAT PERMEATED THE JURY TRIAL. THIS CONSTITUTIONAL ERROR WAS NOT WAIVED, AND THE JURY VERDICTS ENTERED AGAINST MR. JONES MUST THEREFORE BE REVERSED."
 {¶ 12} Appellant contends that his indictment was defective as to the aggravated robbery and murder counts. He argues that the aggravated robbery *Page 3 
count failed to allege a culpable mental state as an element of the offense. Therefore, he asserts that the indictment did not properly charge aggravated robbery. Additionally, the murder count was premised on the theory of felony murder with aggravated robbery as the underlying felony. Consequently, appellant asserts that because the aggravated robbery count was not properly charged, the felony murder count was likewise not properly charged.
 {¶ 13} Appellant argues that per the Ohio Supreme Court's recent decision in State v. Colon, 118 Ohio St.3d 26, 2008-Ohio-1624,885 N.E.2d 917 (Colon I), an indictment that fails to charge a mens rea is constitutionally defective, creates a structural error, and cannot be waived. He contends that the required mental state for aggravated robbery is recklessness.
 {¶ 14} In Colon I, the defendant was convicted of robbery in violation of R.C. 2911.02(A)(2). He appealed arguing that his indictment was defective because it failed to include an element of the offense. The indictment failed to include the mens rea required for robbery. The court of appeals did not address the defect in the indictment and instead held that the defendant waived the issue on appeal because he failed to raise the issue before his trial.
 {¶ 15} The Ohio Supreme Court disagreed. It first pointed out that the indictment was defective because it failed to include the necessary mens rea. Id. at ¶ 10. It noted that the robbery statute did not set out a particular mens rea. However, it went on to conclude that recklessness was the required mental state for a robbery in violation of R.C. 2911.02(A)(2). Id. at ¶ 14.
 {¶ 16} The Court went on to hold: "When an indictment fails to charge a mens rea element of a crime and the defendant fails to raise that defect in the trial court, the defendant has not waived the defect in the indictment." Colon I, 118 Ohio St.3d at the syllabus. The Court found that in that particular case, a structural-error analysis applied due to the constitutional errors that permeated the defendant's trial. *Page 4 
 {¶ 17} Before determining whether a structural-error analysis applies in this case, we must first determine whether the indictment was defective. Here appellant was charged with aggravated robbery in violation of R.C. 2911.01(A)(1), which reads:
 {¶ 18} "(A) No person, in attempting or committing a theft offense, * * * or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 19} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."
 {¶ 20} This statute does not set out a required mental state for aggravated robbery. However, "the mental state of the offender is a part of every criminal offense in Ohio, except those that plainly impose strict liability." Colon, 118 Ohio St.3d at ¶ 11, citing State v.Lozier, 101 Ohio St.3d 161, 2004-Ohio-732, 803 N.E.2d 770, at ¶ 18. Pursuant to R.C. 2901.21(B), "[w]hen the section defining an offense does not specify any degree of culpability, and plainly indicates a purpose to impose strict criminal liability for the conduct described in the section, then culpability is not required for a person to be guilty of the offense. When the section neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense."
 {¶ 21} Accordingly, recklessness is the "catchall" mens rea for offenses that do not mention a required mental state in the statute.Colon I, at ¶ 13, citing Lozier, at ¶ 21. But there is an exception for strict liability statutes where the offender's mental state is irrelevant. Id. For these strict liability offenses, however, the statute must plainly indicate a purpose to impose strict liability. Id.
 {¶ 22} In Colon I, the defendant was convicted of robbery in violation of R.C. 2911.02(A)(2), which provides that no person, in attempting or committing a theft offense, or in fleeing immediately thereafter, shall inflict, attempt to inflict, or threaten to inflict physical harm on another. The Court noted that the statute does not expressly state a degree of culpability for the act of "[i]nflict[ing], attempting] to inflict, or threatening] to inflict physical harm," nor does it plainly indicate that strict liability *Page 5 
is the mental standard. Id. at ¶ 14. Thus, it concluded that the state was required to prove that the defendant recklessly inflicted, attempted to inflict, or threatened to inflict physical harm. Id.
 {¶ 23} In the present case, the aggravated robbery count in appellant's superseding indictment states in pertinent part:
 {¶ 24} "[O]n or about February 22, 2007, at Mahoning County, LARESE JONES did in attempting or committing a theft offense as defined in Section 2913.01 of the Revised Code, or in fleeing immediately after such attempt or offense, have a deadly weapon as defined in Section 2923.11 of the Revised Code, on or about his person or under his control and did display the weapon, brandish it, indicate that he possessed it or used said weapon. In violation of Section 2911.01(A)(1)(C)[.]"
 {¶ 25} The indictment clearly fails to include a mens rea for aggravated robbery. But plaintiff-appellee, the State of Ohio, argues that the indictment was not required to set out a mens rea for aggravated robbery because aggravated robbery is a strict liability offense, which was the exception set out by the Colon I Court.
 {¶ 26} Thus, we must determine whether the required mental state for aggravated robbery pursuant to R.C. 2911.01 (A)(1) is recklessness or whether it is a strict liability offense. If its required mental state is recklessness, then appellant's indictment was defective. If it is a strict liability offense, then the indictment was not defective.
 {¶ 27} Appellee relies on the case of State v. Wharf (1999),86 Ohio St.3d 375, 715 N.E.2d 172, at paragraphs one and two of the syllabus, where the Ohio Supreme Court, in dealing with the robbery statute, held: "The deadly weapon element of R.C. 2911.02(A)(1), to wit, `[h]ave a deadly weapon on or about the offender's person or under the offender's control[,]' does not require the mens rea of recklessness. [And in order to] establish a violation of R.C. 2911.02(A)(1), it is not necessary to prove a specific mental state regarding the deadly weapon element of the offense of robbery." *Page 6 
 {¶ 28} The Supreme Court's holding in Wharf appears to be unaffected by Colon I. Colon I dealt with a different offense, robbery in violation of R.C. 2911.02(A)(2) as opposed to robbery in violation of R.C. 2911.02(A)(1), which was at issue in Wharf. Under section (A)(2), the offender must inflict, attempt to inflict, or threaten to inflict physical harm. But under section (A)(1), the offender must have a deadly weapon on his person or under his control. Simply having a deadly weapon makes robbery under section (A)(1) a strict liability offense. TheWharf Court concluded as much, reasoning:
 {¶ 29} "Had the legislature so intended, it certainly could have required a level of conduct more severe than it did in order to show a violation of the statute. Thus, by employing language making mere possession or control of a deadly weapon, as opposed to actual use or intent to use, a violation, it is clear to us that the General Assembly intended that R.C. 2911.02(A)(1) be a strict liability offense."Wharf, 86 Ohio St.3d at 378.
 {¶ 30} Wharf did not address the aggravated robbery statute at issue here. It only addressed the robbery statute, R.C. 2911.02(A)(1). In fact, Wharf stated:
 {¶ 31} "A violation of R.C. 2911.02(A)(1) will also be found if the offender has a deadly weapon on or about his person, or under his control, while fleeing after such offense or attempt. Thus, no use, display, or brandishing of a weapon, or intent to do any of the aforementioned acts, is necessary according to the plain language of the statute." Id. at 378.
 {¶ 32} A violation of R.C. 2911.01(A)(1), which is at issue in this case, however, does require that the offender "either display the weapon, brandish it, indicate that the offender possesses it, or use it." This distinguishes the mens rea required for a violation of R.C. 2911.01(A)(1) from the mens rea required for a violation of R.C. 2911.02(A)(1).
 {¶ 33} Three appellate districts, however, recently determined thatColon I's holding does not apply to a violation of R.C. 2911.01(A)(1), which is the same statute at issue in our case. *Page 7 
 {¶ 34} In State v. Ferguson, 10th Dist. No. 07AP-640, 2008-Ohio-3827, the defendant was convicted of, in addition to other offenses, aggravated robbery in violation of R.C. 2911.01(A)(1) and robbery in violation of R.C. 2911.02(A)(2). On appeal, he argued that his indictment was defective because it failed to include the mens rea of recklessness as to these counts.
 {¶ 35} The Tenth District first addressed the defendant's contention that because his robbery conviction was under the same section as was the defendant's conviction in Colon I, his indictment had to have included the mental state of recklessness. The appellate court disagreed. It noted that not only was the defendant indicted under R.C. 2911.02(A)(2) the same section as the Colon I defendant, he was charged in the alternative under R.C. 2911.02(A)(1), which was not at issue inColon I. It also noted that the trial court gave a robbery instruction to the jury that encompassed both sections. The court pointed out thatColon I did not address whether recklessness was the required mental state for a violation under R.C. 2911.02(A)(1). Ferguson, at ¶ 38. Relying on Wharf, supra, the court concluded:
 {¶ 36} "[B]ecause the Ohio Supreme Court has determined that R.C. 2911.02(A)(1) is a strict liability offense, and that the deadly weapon element does not require the mens rea of recklessness, we find the provisions of that section of the robbery statute to be unaffected by the holding in Colon." Id. at ¶ 39.
 {¶ 37} The court pointed out that the jury found the defendant guilty of robbery and of aggravated robbery pursuant to R.C. 2911.01(A)(1). Id. at ¶ 40. It then noted that robbery under R.C. 2911.02(A)(1) is a lesser-included offense of aggravated robbery under R.C. 2911.01(A)(1). Id. Because the jury found the defendant guilty of aggravated robbery under R.C. 2911.01(A)(1), the court reasoned that the jury also found the defendant guilty of robbery under R.C. 2911.02(A)(1). Id. at ¶ 41. Because it determined that robbery as charged under R.C. 2911.02(A)(1) does not require the mens rea of recklessness, the court concluded thatColon I did not mandate reversal of the defendant's conviction. Id. *Page 8 
 {¶ 38} The court then went on to address the defendant's aggravated robbery conviction. It noted that Wharf dealt only with R.C. 2911.02(A)(1) and not R.C. 2911.01(A)(1). Id. at ¶ 45. It then addressed the argument that this could distinguish the mental states required for the two offenses.
 {¶ 39} In finding the argument to be without merit, the court first relied on this court's decision in State v. Kimble, 7th Dist. No. 06-MA-190, 2008-Ohio-1539. In Kimble, we found Wharf's reasoning, as set out in State v. Letts (June 22, 2001), 2d Dist. No. 15681, applicable to aggravated robbery in violation of R.C. 2911.01(A)(1). Kimble, at ¶ 27-32. However, that was not the main issue in the case.
 {¶ 40} Additionally, the court relied on the Ohio Jury Instructions Committee Comment. It acknowledged that the Committee Comment was not binding but found it to be persuasive. Ferguson, at ¶¶ 47, 50. The court pointed out:
 {¶ 41} "Following the Ohio Supreme Court's decision in Colon, the Ohio Jury Instructions Committee (`the Committee') revised, through provisional instructions, the jury instructions for aggravated robbery, robbery, and aggravated burglary, in order to comport withColon. In revising the jury instruction for aggravated robbery, the committee inserted the term `recklessly' to the provisions of R.C. 2911.01(A)(3), i.e., that the defendant, while committing or attempting to commit a theft offense `recklessly' inflicted or attempted to inflict serious physical harm on the victim. 4 Ohio Jury Instructions (2008), Section 511.01(A)(3) (Revised 5/3/08). Notably, however, the Committee left unchanged the prior version of the instructions for aggravated robbery under R.C. 2911.01(A)(1), which instructed in part that, before finding a defendant guilty, the jury must find, beyond a reasonable doubt, that the defendant, while committing or attempting to commit a theft offense under R.C. 2913.01(K), `had a deadly weapon (on or about his/her person) (under his/her control) and (displayed) (brandished) (indicated that he/she possessed) (used) the weapon.' 4 Ohio Jury Instructions (2007), Section 511.01(A)(1).
 {¶ 42} "As part of the Comment to the revised instruction for aggravated robbery, the Committee cited Wharf, supra, for the proposition that it is unnecessary *Page 9 
`to prove "recklessness" or any specific mental state with regard to the deadly weapon element of the offense of robbery.' The Committee further noted it `believes this decision [ Wharf ] applies by analogy to R.C. 2911 .01(A)(1).'
 {¶ 43} "While not binding on this court, we find persuasive the Committee's reliance upon Wharf (holding that R.C. 2911.02[A][1] requires no mens rea other than that required for the theft offense) as analogous to the provisions of R.C. 2911.01(A)(1). In the instant case, as appellant was charged with aggravated robbery under R.C. 2911.01(A)(1), and because a violation of that provision requires no intent beyond that required for the theft offense, the state did not err by omitting the mens rea of recklessness in the indictment.Wharf, supra, at 377. Thus, we find the holding in Colon to be inapplicable to appellant's conviction for aggravated robbery under R.C. 2911.01 (A)(1)." Id. at ¶¶ 48-50.
 {¶ 44} In addition to Ferguson from the Tenth District, the Eighth District has reached the same conclusion. It has held that an indictment charging aggravated robbery in violation of R.C. 2911.01(A)(1) is not defective for failing to include the element of recklessness. State v.Peterson, 8th Dist. No. 90263, 2008-Ohio-4239, at ¶ 15 (LikeFerguson, Peterson relied on Wharf, supra, and Kimble, supra). See alsoState v. Saucedo, 8th Dist. No. 90327, 2008-Ohio-3544, at ¶ 13, fn. 1 ("Pursuant to State v. Wharf, 86 Ohio St.3d 375, 1999-Ohio-112, paragraph two of the syllabus, to establish a violation of this section of the aggravated robbery statute, `it is not necessary to prove a specific mental state regarding the deadly weapon element of the offense * * *.' Consequently, the supreme court's recent decision * * * does not apply to the indictment in the instant case.")
 {¶ 45} Likewise, the Third District, also relying on the Tenth District and on Wharf, supra, has found that R.C. 2911.01(A)(1) is a strict liability offense. State v. Jelks, 3d Dist. No. 17-08-18,2008-Ohio-5828.
 {¶ 46} But we cannot reach the same conclusion as our sister districts for the following reasons. *Page 10 
 {¶ 47} The Wharf Court, in explaining why a violation of R.C. 2911.02(A)(1) was a strict liability offense specifically stated: "[B]y employing language making mere possession or control of a deadly weapon,as opposed to actual use or intent to use, a violation, it is clear to us that the General Assembly intended that R.C. 2911.02(A)(1) be a strict liability offense." (Emphasis added.) Wharf,86 Ohio St.3d at 378. This statement implies that if something more than mere possession or control of a deadly weapon were required, such as use or intent to use, then it would demonstrate that the General Assembly did not intend the offense to be a strict liability offense. Such is the case here dealing with R.C. 2911.01(A)(1), which requires that the offender not only have a deadly weapon on his person or under his control but also requires that the offender "display the weapon, brandish it, indicate that the offender possesses it, or use it." This additional element goes a step beyond mere possession and requires that the offender actuallydo something instead of simply possess something. In fact, that is the element that distinguishes aggravated robbery from robbery.
 {¶ 48} Furthermore, in Colon I, one of the Court's reasons for finding that recklessness is the required mental state for a violation of R.C. 2911.02(A)(2), was that the statute "does not specify a particular degree of culpability for the act of `[i]nflict[ing], attempting] to inflict, or threatening] to inflict physical harm,' nor does the statute plainly indicate that strict liability is the mental standard."Colon I, 118 Ohio St.3d at ¶ 14. The same can be said about R.C. 2911.01(A)(1). The statute does not specify a particular degree of culpability for the act of "displaying] the weapon, brandishing] it, indicating] that the offender possesses it, or us[ing] it." And the statute does not plainly indicate that strict liability is the mental standard. Thus, recklessness is the required mental state for a violation of R.C. 2911.01(A)(1) as well.
 {¶ 49} Furthermore, while the Tenth District relied in part on this court's Kimble decision in reaching its conclusion that R.C. 2911.01(A)(1) is a strict liability offense, we must point out that we decided Kimble before the Ohio Supreme Court decided Colon I. The Supreme Court's Colon I holding trumps our ruling in Kimble. *Page 11 
 {¶ 50} For all of these reasons, we conclude that R.C. 2911.01(A)(1) is not a strict liability offense. Instead we find that recklessness is the required mens rea for a violation of R.C. 2911.01(A)(1).
 {¶ 51} Our finding is supported by the recent Ohio State Supreme Court case State v. Davis, 119 Ohio St.3d 113, 892 N.E.2d 446, 2008-Ohio-3879. The Davis Court, without opinion, simply reversed the court of appeals' holding on the authority of Colon I. In Davis, the defendant argued that his indictment was defective for failing to include the mens rea for his charged offense. In turning to the indictment in the Davis case along with the State's brief on a motion for reconsideration, it becomes evident that the defendant in that case was indicted on an aggravated robbery count in violation of R.C. 2911.01(A)(1), the same statute at issue here, and that he argued that his indictment was defective for failing to include the mens rea of recklessness, the same argument appellant makes here.
 {¶ 52} The court of appeals held that because the defendant failed to raise this issue in the trial court, he waived it for purposes of appeal. State v. Davis, 8th Dist. No. 88895, 2007-Ohio-5843, ¶ 38. The Supreme Court reversed based on Colon I, which held, as stated above: "When an indictment fails to charge a mens rea element of a crime and the defendant fails to raise that defect in the trial court, the defendant has not waived the defect in the indictment." Colon I, 118 Ohio St.3d at the syllabus. Thus, the Court determined that theDavis indictment failed to charge a mens rea and that the defendant did not waive this issue. Consequently, the Court implicitly determined that recklessness is the required mental state for a violation of R.C. 2911.019(A)(1).
 {¶ 53} Because recklessness is the required mental state for aggravated robbery in violation of R.C. 2911.01(A)(1), appellant's indictment was clearly defective for failing to charge this element of the offense of aggravated robbery. Likewise, the indictment was also defective in its charge of felony murder because aggravated robbery was the underlying felony for the felony murder count. Thus, our *Page 12 
analysis must proceed to determine what standard of review applies in this case given the fact that appellant did not raise this issue in the trial court.
 {¶ 54} The Colon I Court addressed whether an indictment that failed to charge the mens rea of the offense could be raised for the first time on appeal. It concluded that it could, noting that in Colon's case the defect resulted in structural error. Id. at ¶ 19. The Court observed that the case could be decided under the plain error analysis of Crim. R. 52(B), because the defendant's substantial rights were prejudiced and he failed to raise an objection in the trial court. Id. at ¶ 23. But the Court found that the defect in the indictment resulted in significant errors throughout the defendant's trial and, therefore a structural-error analysis was warranted. Id. It stated: "[Structural errors permeate the trial from beginning to end and put into question the reliability of the trial court in serving its function as a vehicle for determination of guilt or innocence." Id.
 {¶ 55} The Court determined that the defective indictment constituted a constitutional error, which is first required in order to find structural error, because in order for an indictment to be constitutionally sound it "must, first, contain `"the elements of the offense charged and fairly inform a defendant of the charge against which he must defend, and, second, enable him to plead an acquittal or conviction in bar of future prosecutions for the same offense."' Id. at ¶ 27, quoting State v. Childs (2000), 88 Ohio St.3d 558, 565,728 N.E.2d 379, quoting Hamling v. United States (1974), 418 U.S. 87, 117-118,94 S.Ct. 2887, 41 L.Ed.2d 590. The Court found that because the indictment did not include all of the essential elements of the offense, it was constitutionally unsound. Id. This was the first constitutional error the Court found.
 {¶ 56} The Court found several other constitutional errors as well. Second, it found that there was no evidence in the record that the defendant had notice that the state was required to prove that he had acted recklessly. Id. at ¶ 30. Thus, the Court concluded that the defendant's due process rights were violated. Id. Third, the Court found that when the trial court instructed the jury on the elements of robbery *Page 13 
necessary to find the defendant guilty, the court did not include the required mens rea for the offense. Id. at ¶ 31. And finally, the Court pointed out that during closing arguments, the prosecutor treated robbery as a strict liability offense. Id.
 {¶ 57} After reading Colon I, it would appear that a structural-error analysis would be proper in many cases where the indictment failed to charge the mens rea of an offense and the defendant failed to raise the issue in the trial court. However, the Court elaborated on Colon I inState v. Colon, 119 Ohio St.3d 204, 893 N.E.2d 169, 2008-Ohio-3749
(Colon II), which involved a motion for reconsideration of Colon I.
 {¶ 58} In Colon II, the Court first pointed out that the rule announced in Colon I is prospective and applies only to those cases pending on the date that it was released. Id. at ¶ 5.
 {¶ 59} The Court then went on to explain Colon I: "We assume that the facts that led to our opinion in Colon I are unique. As we stated inColon I, the defect in the defendant's indictment was not the only error that had occurred: the defective indictment resulted in several other violations of the defendant's rights." Id. at ¶ 6 citing Colon I, 118 Ohio St.3d at ¶ 29. The Court noted that in addition to the defective indictment, the defendant had no notice that recklessness was an element of the charged offense, the state did not argue that the defendant's conduct was reckless, the trial court did not instruct the jury on the element of recklessness, and the prosecutor treated robbery as a strict liability offense in closing arguments. Id.
 {¶ 60} The Court then continued: "In a defective-indictment case that does not result in multiple errors that are inextricably linked to the flawed indictment such as those that occurred in Colon I, structural-error analysis would not be appropriate." Id. at ¶ 7. Instead, the Court stated that a plain error analysis is proper when a defendant fails to object to an indictment that is defective because it does not charge an essential element of an offense. Id. The Court stated: "In most defective-indictment cases in which the indictment fails to include an essential element of the charge, we expect that plain-error analysis, pursuant to Crim. R. 52(B), will be the proper analysis to apply." Id. It went on: *Page 14 
 {¶ 61} "Applying structural-error analysis to a defective indictment is appropriate only in rare cases, such as Colon I, in which multiple errors at the trial follow the defective indictment. In Colon I, the error in the indictment led to errors that `permeate[d] the trial from beginning to end and put into question the reliability of the trial court in serving its function as a vehicle for determination of guilt or innocence.' Id. at ¶ 23, citing State v. Perry, 101 Ohio St.3d 118,2004-Ohio-297, 802 N.E.2d 643, at ¶ 17. Seldom will a defective indictment have this effect, and therefore, in most defective indictment cases, the court may analyze the error pursuant to Crim. R. 52(B) plain-error analysis. Consistent with our discussion herein, we emphasize that the syllabus in Colon I is confined to the facts in that case." Id. at ¶ 8.
 {¶ 62} In the present case, appellant did not object to the alleged defect in the indictment in the trial court. Instead, he raises the issue for the first time on appeal. Given the Court's statements inColon II, a plain-error analysis applies here because multiple errors stemming from the alleged defective indictment are not present as they were in Colon I.
 {¶ 63} Plain error should be invoked only to prevent a clear miscarriage of justice. State v. Underwood (1983), 3 Ohio St.3d 12, 14,444 N.E.2d 1332. Plain error is one in which but for the error, the outcome of the trial would have been different. State v. Long (1978), 53 Ohio St.2d 91, 97, 372 N.E.2d 804. Pursuant to Crim. R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."
 {¶ 64} Here the defective indictment did not constitute plain error.
 {¶ 65} In this case, the indictment failed to include the element of recklessness in the aggravated robbery count. Thus, the indictment failed to include an essential element of the offense of aggravated robbery and, it follows, felony murder. However, this fact does not lead to the conclusion that appellant's convictions must be reversed. *Page 15 
 {¶ 66} Under the plain error analysis, appellant must demonstrate that the outcome of his trial would have been different were it not for the defect in his indictment. Appellant cannot do this.
 {¶ 67} Both appellant and the state proceeded through the trial as if knowingly was the required mental state for aggravated robbery. The prosecutor used knowingly as the required mental state in closing arguments. More significantly the trial court instructed the jury on the mental state of knowingly. (Tr. 746-47). Because the jury is presumed to follow the court's jury instructions, we can conclude that the jury found that appellant acted with the knowingly mens rea in committing the aggravated robbery. Knowingly is a more difficult mental state to prove than recklessly. Thus, appellant suffered no prejudice as a result of the defective indictment. Had the indictment listed the proper mental state of recklessly, the outcome of appellant's trial would not have changed.
 {¶ 68} Accordingly, appellant's first assignment of is without merit.
 {¶ 69} Appellant's second assignment of error states:
 {¶ 70} "LARESE JONES WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT ENTERED A JUDGMENT OF CONVICTION AGAINST HIM IN THE ABSENCE OF SUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION."
 {¶ 71} Here appellant argues that his convictions were not supported by sufficient evidence. He contends that the evidence failed to show that he shared Helms's mindset to participate in an armed robbery of Klamer Jr. Appellant asserts that his testimony as to a lack of any involvement in a planned robbery or drug sale was uncontroverted. He contends that he merely drove Helms to Klamer Jr.'s house but that he had no expectation that a robbery was to occur and was unaware that Helms was armed. Appellant asserts that even Klamer III could not point to any evidence that appellant was involved in the aggravated robbery of his father. It follows, appellant argues, that if he had no intent to participate in the underlying *Page 16 
aggravated robbery, he cannot be held liable for Helms's death under the felony-murder theory.
 {¶ 72} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict.State v. Smith (1997), 80 Ohio St.3d 89, 113, 684 N.E.2d 668. In essence, sufficiency is a test of adequacy. State v. Thompkins (1997),78 Ohio St.3d 380, 386, 678 N.E.2d 541. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Smith, 80 Ohio St.3d at 113.
 {¶ 73} The jury convicted appellant of complicity to commit aggravated robbery and felony murder. It also convicted him of complicity to commit trafficking in drugs.[1] As set out above, the aggravated robbery section under which appellant was convicted states:
 {¶ 74} "(A) No person, in attempting or committing a theft offense, * * * or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 75} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it." R.C. 2911.01(A)(1).
 {¶ 76} A theft offense includes: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * without the consent of the owner or person authorized to give consent." R.C. 2913.02(A)(1). *Page 17 
 {¶ 77} Complicity is defined as, "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2).
 {¶ 78} And the murder section under which the jury convicted appellant provides:
 {¶ 79} "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * * ."
 {¶ 80} Thus, we must examine the evidence to determine whether it was sufficient to support appellant's convictions on these offenses.
 {¶ 81} Klamer III was the first witness to testify. He stated that on the morning in question Klamer Jr. told him that two people were on their way over and had him count out one thousand dollars. (Tr. 307). Two black males then arrived at his father's house, one of which he identified as appellant. (Tr. 308). He stated that appellant used crutches to walk into the house and then sat down in a chair. (Tr. 309). Klamer III stated that the other man remained standing and talked with Klamer Jr. (Tr. 311-12). Klamer III testified that the other man then pointed a gun at Klamer Jr. (Tr. 312). Klamer Jr. consequently pulled out his gun and chased the man into the kitchen. (Tr. 312). Klamer III stated that his father had a revolver and the man he was chasing had a pistol. (Tr. 312). At this point in time, Klamer III stated that he ran out of the house. (Tr. 312). He heard gunshots as he ran out of the house. (Tr. 312-13). Klamer III believed that his father was being robbed. (Tr. 333). Klamer III stated that appellant ran out of the house too. (Tr. 313).
 {¶ 82} After leaving for a short period of time, Klamer III returned to his father's house. Klamer III saw Helms bleeding on the kitchen floor. (Tr. 337-38). He stated that Klamer Jr. told him that he was being robbed and that he just killed Helms. (Tr. 338). Klamer III also stated that his father told him that he had been shot in the finger and Klamer III noticed that his father's finger was bleeding. (Tr. 339). Klamer III stated that Klamer Jr. took some pills and told him that he was trying to overdose. *Page 18 
(Tr. 313). Klamer III stated that his father gave him some rings and the thousand dollars he had previously counted out. (Tr. 314). Klamer III then left and called the police. (Tr. 314).
 {¶ 83} Klamer III also testified that he never actually heard anyone say that they were going to rob his father. (Tr. 322-23). And he stated that as far as he knew, neither appellant nor the other man took anything from his father. (Tr. 323). Klamer III further stated that when the gunshots broke out, appellant seemed as frightened as he was and simply ran from the house. (Tr. 335-36).
 {¶ 84} Next, Klamer Jr.'s friend, Emil Sopkovich, testified. Sopkovich stated that on the morning in question, Klamer Jr. called him sounding distraught. (Tr. 348). He stated that Klamer Jr. told him that if he wanted to see him he should get over to his house. (Tr. 348). According to Sopkovich, Klamer Jr. stated that he was robbed and that gunshots were exchanged. (Tr. 349). Sopkovich testified that Klamer Jr. stated that "they" robbed him. (Tr. 349, 356). However, Klamer Jr. did not specifically say "two" people. (Tr. 349).
 {¶ 85} Dr. Robert Belding, a deputy coroner, testified that Helms's cause of death was a gunshot wound to the head. (Tr. 416).
 {¶ 86} Detective Spotleson was the last witness to testify for the state. He first testified that he found a pair of crutches inside Klamer Jr.'s house. (Tr. 517). He stated that he knew appellant was an amputee and used crutches. (Tr. 517). Detective Spotleson next testified that Klamer III turned in $1,000 that he indicated was for the purpose of purchasing 90 Oxycontin pills. (Tr. 512).
 {¶ 87} Detective Spotleson then testified regarding his interview of appellant. According to Detective Spotleson, appellant revealed the following.
 {¶ 88} In his first version of events, appellant stated that he dropped Helms off at the Klamer residence to make a drug transaction. (Tr. 523). He stated that he never went into the Klamer house. (Tr. 524). Appellant stated that Helms had 90 Oxycontin pills in a plastic bag with him. (Tr. 523-24). He further stated that while he never saw a gun on Helms that day, he knew that Helms always carried a gun with *Page 19 
him when he made a drug deal. (Tr. 524-25). He further described the gun. (Tr. 525).
 {¶ 89} Detective Spotleson then confronted appellant with the fact that police found his crutches inside Klamer Jr.'s house. (Tr. 525). Appellant stated that the reason his crutches were found inside the house was because Helms had asked to borrow the crutches. (Tr. 525-26). Appellant stated that this request made his "antennas" go up. (Tr. 526). This indicated to appellant that a robbery was going to take place and Helms's use of the crutches would make the Klamers feel more comfortable with Helms. (Tr. 526). Appellant stated that he knew at this point that a robbery was going to take place because "he's not a stupid person," "he knows what's going to go on," and "[h]im and Helms are good friends." (Tr. 526, 570). Appellant stated that he offered to stay with Helms and give him a ride but Helms told him to leave, so he left. (Tr. 526-27). Appellant then stated that as he drove away, he received a phone call from his girlfriend stating that the police had been to his house looking for him on an unrelated matter. (Tr. 528-29). However, Detective Spotleson informed appellant that Klamer III had heard the phone call, which indicated that appellant was in the Klamer house. (Tr. 529).
 {¶ 90} Appellant then changed his story. He once again admitted he knew there was going to be a robbery. (Tr. 532, 570). But this time he stated that he did in fact go into the Klamer house. (Tr. 532). He also stated that he was going to be Helms's getaway driver. (Tr. 532, 570). He then gave a statement of the events that mirrored Klamer III's statement. (Tr. 532-33). Appellant further indicated that he heard three gunshots and ran/hobbled out of the house. (Tr. 533).
 {¶ 91} To support appellant's conviction for aiding and abetting, the evidence had to demonstrate that appellant supported, assisted, encouraged, cooperated with, advised, or incited Helms in the commission of the aggravated robbery, and that appellant shared Helms's criminal intent. State v. Johnson (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, at the syllabus. His intent could be inferred from the circumstances surrounding the crime. Id. To "aid and abet" is "`[t]o assist or facilitate *Page 20 
the commission of a crime, or to promote its accomplishment.'" Id. at 243, quoting Black's Law Dictionary (7 Ed.Rev.1999) 69. This can be inferred from the circumstances surrounding the crime. Participation in criminal intent may be inferred from one's presence, companionship, and conduct before and after the offense is committed. Id. at 245, citingState v. Pruett (1971), 28 Ohio App.2d 29, 34, 273 N.E.2d 884.
 {¶ 92} Additionally, the defendant's mere association with the principal offender is not enough to prove complicity. State v.Mootispaw (1996), 110 Ohio App.3d 566, 570, 674 N.E.2d 1222. The defendant must have had some level of active participation by way of providing assistance or encouragement. State v. Nievas (1997),121 Ohio App.3d 451, 456, 700 N.E.2d 339; State v. Sims (1983),10 Ohio App.3d 56, 58, 460 N.E.2d 672.
 {¶ 93} Appellant compares the instant case to State v. Ratkovich, 7th Dist. No. 02-JE-16, 2003-Ohio-7286. In Ratkovich, a mother was convicted of complicity to commit theft. We reversed her conviction finding that she did not support, assist, encourage, cooperate with, advise, or incite her son in the commission of the theft. The facts revealed that Ratkovich drove her son to Circuit City and waited in the parking lot while he went into the store. While in the store, her son stole two Sony Play Station game systems. He then ran out of the store and jumped into Ratkovich's car. He told his mother that he had just stolen something and yelled at her to go. Ratkovich drove her son away from the store even though a manager from the store hollered for her to stop.
 {¶ 94} In reversing the conviction, we reasoned that the evidence did not suggest that Ratkovich knew what her son was planning to do when she dropped him off at Circuit City. This distinguishes Ratkovich from the case at bar. In Ratkovich, the evidence clearly demonstrated that the defendant was unaware of her son's intent to rob the store when she dropped him off. In fact, her son testified to this at her trial. In this case, the evidence demonstrates that appellant knew of Helms's intent when he drove him to Klamer Jr.'s house. *Page 21 
 {¶ 95} Appellant also compares this case to State v. Langford, 8th Dist. No. 83301, 2004-Ohio-3733. Langford was convicted of two counts of complicity to commit aggravated robbery and two counts of theft. He argued that there was insufficient evidence to support his convictions and the appellate court agreed. The evidence demonstrated that in one of the robberies, appellant and his co-defendant, Washington went to a convenience store where they purchased cigarettes. Washington then drove a few streets away from the convenience store and parked the car. He told Langford that he would be right back. Langford waited in the car. When asked what he thought Washington did when he left the car, Langford stated that he figured Washington knew someone or wanted to pick up something but at one point he thought Washington might commit a robbery. When Washington returned to the car, he directed Langford to drive, which he did. The evidence demonstrated that in the other robbery, the two men were driving around when they stopped at a Marathon Station. Washington told Langford that they were going to pick up some money from someone. Langford admitted that he suspected that a robbery was about to occur. Langford again remained in the car. Washington robbed the store. When Washington returned to the car, he "floored it" and drove the car away.
 {¶ 96} In reversing Langford's convictions, the court found that the fact that Langford drove the car after Washington committed the first robbery was not tantamount to driving a getaway car. Id. at ¶ 22. It pointed out that there was no evidence that indicated that Langford sped away to flee the scene or to assist in the commission of the robbery. Id. The court also pointed out that after Washington robbed the Marathon station, he did not allow Langford to drive. Id. Thus, the court concluded:
 {¶ 97} "The record is devoid of any evidence that would implicate Langford in the commission of these robberies beyond mere presence in the vehicle and association with Washington. While Langford may have used poor judgment in accompanying Washington, this poor judgment does not amount to criminal activity. *Page 22 
Langford was a bystander, merely along for the ride, and his presence at the scene of the crime or association with the offender is not sufficient to prove that he was an aider and abettor." Id. at ¶ 23.
 {¶ 98} The present case is also distinguishable fromLangford. First, in this case, per Detective Spotleson's testimony, appellant knew that Helms was going to Klamer Jr.'s house for a drug deal and a robbery. Appellant drove Helms to the Klamer residence knowing this all along. Appellant also knew that Helms "always" carried a gun with him when making a drug deal. So it is safe to conclude that appellant knew Helms had a gun on him that day. There was no testimony in Langford that Langford knew Washington was armed on the days of the robberies nor did Langford drive Washington to the scenes of the robberies. Langford was simply in the car. Furthermore, appellant accompanied Helms into Klamer Jr.'s house. He did not merely wait in the car. By taking the step of accompanying Helms into the house, he provided support for Helms. In Langford, however, Langford merely waited in the car.
 {¶ 99} The witnesses' testimony in this case supports appellant's aggravated robbery conviction. According to Detective Spotleson, appellant knew that Helms was going to the Klamer residence to sell 90 Oxycontin pills. He further knew that Helms "always" carried a gun with him when making a drug sale. He even described the gun. Additionally, appellant admitted to Detective Spotleson that he knew that Helms was going to commit a robbery at the Klamer residence. With this information in mind, appellant drove Helms to the Klamer residence, accompanied Helms inside, and intended to be Helms's getaway driver. Additionally, Klamer III testified that he believed that his father was being robbed. And Sopkovich testified that Klamer Jr. told him that "they" robbed him.
 {¶ 100} This evidence, when viewed in the light most favorable to the prosecution, supports appellant's conviction for complicity to commit aggravated robbery. *Page 23 
 {¶ 101} Appellant's felony murder conviction was likewise supported by sufficient evidence. It is irrelevant, under the felony-murder rule, whether the killer is the defendant, an accomplice, or a third party such as the victim. State v. Franklin, 7th Dist. No. 06-MA-79,2008-Ohio-2264, ¶ 111. Instead, the relevant inquiry is whether the victim's death was a proximate result of the defendant's conduct. Id. at ¶ 121.
 {¶ 102} In this case, had appellant and Helms not been involved with an aggravated robbery at the Klamer residence, Helms would not have been killed. Thus, but for the robbery, Helms would still be alive. It should have been reasonably foreseeable to appellant that if he aided Helms in an armed robbery, that someone would get shot.
 {¶ 103} Appellant's argument as to his murder conviction is that because his aggravated robbery conviction was not supported by sufficient evidence, his murder conviction is likewise unsupported by sufficient evidence because aggravated robbery was the underlying felony in his felony-murder conviction. As discussed above, appellant's aggravated robbery conviction is supported by sufficient evidence. Thus, appellant's conviction under the felony-murder rule is likewise supported by sufficient evidence.
 {¶ 104} Accordingly, appellant's second assignment of error is without merit.
 {¶ 105} Appellant's third assignment of error states:
 {¶ 106} "THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY ON OHIO COMPLICITY LAW, THUS DEPRIVING MR. JONES OF HIS RIGHT TO A FAIR TRIAL BEFORE A PROPERLY INSTRUCTED JURY."
 {¶ 107} Appellant takes issue here with several jury instructions. Appellant concedes that his counsel failed to object to the jury instructions but argues that the errors he now raises constituted plain error.
 {¶ 108} The trial court's instructions to the jury regarding complicity were as follows: *Page 24 
 {¶ 109} "The State has indicated to you that they are proceeding on a theory of complicity. That is, they're not saying that Larese Jones was the principal offender. The principal offender is the person who actually commits each and every element of the crime. A complicitor is one who helps or assists or does something along the way to participate with the principal in the commission of the crime.
 {¶ 110} "And the law of the State of Ohio is just in its statement that anybody who helps somebody commit a crime is just as guilty as the person who commits the crime. That's the law, and you're bound to follow it. So the law under 2923.03 says that no person, acting with the kind of culpability — — culpability is the mental state that you know what you're doing, or you have a person to do what you're doing — — so no person acting with the kind of culpability required for the commission of an offense shall aid or abet another in committing an offense. Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender.
 {¶ 111} "A charge of complicity may be stated in terms of this section, complicity, or in terms of the principal offense. So when I read this, and when it was presented to you as principal offenses, it is in the alternative, as a complicity type of an offense. So if one is a principal or a complicitor, they're equally guilty of a particular offense.
 {¶ 112} "So in each of these charges the defendant is charged with complicity in the commission of the offenses. Before you can find him guilty of any of these offenses as a complicitor, you must find beyond a reasonable doubt that on or about the 22nd day of February, 2007, in Mahoning County, Ohio, this defendant, Larese Jones, aided or abetted another in committing the offense of aggravated robbery or in committing the offense of aggravated trafficking in drugs. Aided or abetted means supported, assisted, encouraged, cooperated with, advised, incited, helped, participated with.
 {¶ 113} "It is no defense to a charge of complicity that no person with whom the defendant was in complicity has been convicted as a principal offender or co-complicitor. *Page 25 
The defendant cannot be found guilty of complicity unless an offense was actually attempted or committed.
 {¶ 114} "* * *
 {¶ 115} "So to support a conviction for complicity by aiding and abetting another, the evidence must show that this defendant supported, assisted, encouraged, cooperated with, advised, helped, or incited a principal in the commission of a crime, and that this defendant shared the criminal intent of the principal to commit an aggravated robbery and/or to commit an aggravated trafficking in drugs. Such intention may be inferred from all of the facts and circumstances surrounding the crime or crimes.
 {¶ 116} "Evidence of aiding and abetting another in the commission of a crime may be demonstrated by both direct and circumstantial evidence. Thus, participation in criminal intent may be inferred from the defendant's presence, companionship and conduct before, during and after the offense is committed.
 {¶ 117} "If you find beyond a reasonable doubt that Larese Jones knowingly helped, aided, assisted, encouraged or directed himself with another in the commission of aggravated robbery or aggravated trafficking in drugs or of any of the crimes charged in the indictment, he is to be regarded as if he was the principal offender, and would be just as guilty as if he personally performed every act constituting the offense.
 {¶ 118} "When two or more persons have a common purpose to commit a crime, and one does one part, and a second performs another, those acting together are equally guilty of the crime. However, mere association with one who perpetrates an unlawful act does not render a person a participant in the crime, so long as all of his acts are innocent.
 {¶ 119} "So for complicity * * * The definitions have been given to you. And very simply, complicity is defined as no person acting with the kind of culpability required for the commission of an offense, shall aid or abet another in committing the offense." (Tr. 732-37). *Page 26 
 {¶ 120} Appellant first contends that the trial court failed to properly charge the jury regarding complicity.
 {¶ 121} As can be seen from the instructions quoted above, the trial court thoroughly explained the law of complicity. It spent a considerable amount of time describing the concept to the jury and described it in several different ways.
 {¶ 122} Appellant further contends that the jury instructions were complicated by the fact that the court gave instructions on both felony murder and involuntary manslaughter. He contends that the state could not proceed on both theories and the court should have only instructed the jury on one or the other.
 {¶ 123} Involuntary manslaughter is a lesser included offense of felony murder, "`because the only distinguishing factor is the mental state involved in the act.'" State v. Williams, 8th Dist. No. 88873,2007-Ohio-4845, at ¶ 32, quoting State v. Lynch, 98 Ohio St.3d 514,2003-Ohio-2284, 787 N.E.2d 1185. A charge on a lesser-included offense is warranted if the evidence adduced at trial would support it.State v. Thomas (1988), 40 Ohio St.3d 213, 216, 533 N.E.2d 286.
 {¶ 124} In this case, the evidence supported an involuntary manslaughter instruction. In order to find appellant guilty of murder, the jury had to first find appellant guilty of aggravated robbery. That is because aggravated robbery is a first-degree, violent felony. In order for an offender to be found guilty of felony murder, the underlying felony involved must have been a violent felony of the first or second degree. R.C. 2903.02(B). If the jury found appellant not guilty of aggravated robbery, then it could not find him guilty of felony murder. However, it could have still found him guilty of involuntary manslaughter. To find appellant guilty of involuntary manslaughter, the jury had to find that appellant proximately caused Helms's death as a result of his committing or attempting to commit a felony. R.C. 2903.04(A). The underlying felony for involuntary manslaughter does not have to be a violent felony. In this case, the jury found appellant guilty of aggravated trafficking in drugs, which is not a violent felony. However, it satisfies R.C. 2903.04(A)'s underlying felony requirement. Thus, if the jury found that appellant was not guilty of aggravated *Page 27 
robbery but was guilty of aggravated trafficking in drugs, it then could have found him guilty of involuntary manslaughter but not felony murder. Accordingly, instructions on both felony murder and involuntary manslaughter were warranted.
 {¶ 125} Appellant next argues that the court should never have instructed the jury on felony murder since the state failed to prove that he aided or abetted Helms in the aggravated robbery.
 {¶ 126} As discussed in appellant's second assignment of error, however, sufficient evidence existed upon which the jury could conclude that appellant aided and abetted Helms in the robbery of Klamer Jr. Thus, the felony murder instruction was proper.
 {¶ 127} Appellant also takes issue with two specific instructions. The first stated:
 {¶ 128} "Now, the difference between murder in Count 3 and manslaughter in Count 4, manslaughter says that no person shall cause the death of another as the proximate result of his committing or attempting to commit a felony. So murder is a dangerous felony, a felony of the first degree, and a felony of violence such as aggravated robbery, and manslaughter is the same, causing the death of another, but as a proximate result of committing a different felony. Aggravated trafficking in drugs, which is not a felony of violence; okay? So there's the difference between murder and manslaughter as charged in this case.
 {¶ 129} "So regarding the culpability of one who is a perpetrator in a violent felony, or in another felony, and someone is killed as a result thereof, the court would say to you that if a death occurs, as a proximate result of one's committing or attempting to commit a dangerous felony in this murder case, or a different felony as in the manslaughter case, those who originally engaged in the crime or attempt to commit the crime of aggravated robbery and/or aggravated trafficking in drugs, are responsible for the death of another, regardless of who may have shot and killed the victim of the shooting. Okay?" (Tr. 761-62). *Page 28 
 {¶ 130} Appellant contends that this instruction told the jury that if appellant committed one of the felonies in this case, either aggravated robbery or aggravated trafficking in drugs, he could be held liable for murder regardless of who shot Helms. However, he contends that he could have only been found guilty of murder if the jury found him guilty of aggravated robbery, not aggravated trafficking in drugs, because that is how the murder count was worded in the indictment.
 {¶ 131} While the trial's court's instructions could have been more clear on this point, the court got the message across to the jury that if they found appellant guilty of aggravated robbery, a violent felony, then they could find him guilty of murder. But if they only found him guilty of aggravated trafficking in drugs, not a violent felony, then they could only convict him of manslaughter.
 {¶ 132} Furthermore, even if the court's instruction in this regard was in error, no plain error resulted. The jury found appellant guilty of aggravated robbery. Thus, they could properly convict him of murder.
 {¶ 133} Finally, appellant specifically points to the following instruction as shifting the burden of proof from the state to him:
 {¶ 134} "When two or more persons have a common purpose to commit a crime, and one does one part, and a second performs another, those acting together are equally guilty of the crime. However, mere association with one who perpetrates an unlawful act does not render a person a participant in the crime, so long as all of his acts areinnocent." (Emphasis added; Tr. 737).
 {¶ 135} This one phrase, however, does not taint the entire jury instructions as appellant alleges. In examining the trial court's jury instructions we must review the court's charge as a whole, not in isolation, in determining whether the jury was properly instructed.State v. Burchfield (1993), 66 Ohio St.3d 261, 262, 611 N.E.2d 819. When doing so in this case, it is apparent that the court communicated to the jury that the burden was on the state to prove each and every element of the crimes charged beyond a reasonable doubt. *Page 29 
 {¶ 136} On no less than 13 occasions, the court instructed the jury that the state's burden was proof beyond a reasonable doubt and/or that appellant was presumed innocent. (Tr. 724, 734, 736, 737-38, 739, 741, 742, 744, 746, 749, 752, 757, 763). And the court emphasized, "in all of these instructions, the State bears the burden of proving that the defendant did indeed [commit or aid and abet in each and every element of each offense]. If the State fails in that burden, the defendant must be found not guilty of one or more of those offenses." (Tr. 757). Thus, the jury instructions, when read as a whole, more than adequately informed the jury that they could not find appellant guilty of any offense unless the state proved each and every element of the offenses beyond a reasonable doubt.
 {¶ 137} For these reasons, appellant's third assignment of error is without merit.
 {¶ 138} Appellant's fourth assignment of error states:
 {¶ 139} "MR. JONES WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, IN CONTRAVENTION OF THE SIXTH ANDFOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION."
 {¶ 140} Here appellant argues that his trial counsel was ineffective.
 {¶ 141} To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley
(1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance. Id. To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different.Bradley, 42 Ohio St.3d at paragraph three of the syllabus. *Page 30 
 {¶ 142} Appellant bears the burden of proof on the issue of counsel's effectiveness. State v. Calhoun (1999), 86 Ohio St.3d 279, 289,714 N.E.2d 905. In Ohio, a licensed attorney is presumed competent. Id.
 {¶ 143} Appellant asserts two instances of ineffectiveness. First, he asserts that his counsel failed to object to the jury instructions.
 {¶ 144} As discussed in appellant's third assignment of error, the court's jury instructions were not improper. Therefore, his counsel cannot be said to have been ineffective for failing to object to them.
 {¶ 145} Second, appellant contends that his counsel made a statement in his closing argument that implied that appellant was lying.
 {¶ 146} The comment appellant takes issue with is as follows:
 {¶ 147} "As I suggested in my opening statement, you folks are going to have a hard job, because basically this trial is kind of like going to a liars' convention. I mean, there's nobody who's telling thetruth, and nobody will ever find out what exactly happened that day." (Emphasis added; Tr. 705).
 {¶ 148} This single statement when taken alone might indicate that appellant, who was one of the witnesses, was also one of the liars. But appellant's counsel continued:
 {¶ 149} "You know, taken that situation where the State has presented you with a scenario that you have liars on top of liars, and inconsistencies on top of inconsistencies, and explanations on top of explanations, and none of them add up, none of them make sense. I mean, there's not a single thing that — — the detectives went back to the scene. They tried to reconstruct what happened. They tried the best they could to say, well, what was positioned where? What happened? You know, from the — — they talked to the neighbors. They tried to figure out how this could've happened, and they come up with a zero." (Tr. 705-706).
 {¶ 150} Thus, while counsel's first statement would seem to include appellant as one of the "liars," his next statement clarified that he was speaking only of the state's witnesses when he referred to the liars. *Page 31 
 {¶ 151} And as appellee points out, appellant admitted several times on the stand that he had lied to Detective Spotleson during his interview. (Tr. 604, 618, 628-29). Thus, even if appellant's counsel had been referring to appellant when he referred to the liars, he would have been speaking the truth. It could be seen as part of his trial strategy to speak openly and honestly about his client's lies to the police. The content of a closing argument is generally considered a tactical decision. State v. Baker, 7th Dist. No. 03-CO-24, 2003-Ohio-7008, at ¶ 18. A reviewing court should refrain from second-guessing an attorney's trial strategy. State v. Carter (1995), 72 Ohio St.3d 545,558, 651 N.E.2d 965.
 {¶ 152} Consequently, appellant's trial counsel was not ineffective. Therefore, appellant's fourth assignment of error is without merit.
 {¶ 153} For the reasons stated above, the trial court's judgment is hereby affirmed.
[1] Appellant does not allege that his trafficking in drugs conviction was not supported by sufficient evidence. He does contend that he should be afforded a new trial on the trafficking charge. But he gives no reasons for this request. Thus, there is no reason to reverse appellant's drug trafficking conviction. *Page 1