JOURNAL ENTRY AND OPINION *Page 2 
{¶ 1} Defendant Sharon Williams appeals from her conviction for involuntary manslaughter. For the reasons set forth below, we affirm.
 {¶ 2} On September 20, 2005, defendant was indicted for one count of purposeful murder, one count of felony-murder with felonious assault as the underlying felony, and two counts of felonious assault in connection with the death of her ex-husband, Darryl Williams. Defendant pled not guilty and also moved to suppress the evidence obtained at her home. Following an evidentiary hearing, the trial court denied the motion, and the matter proceeded to a jury trial on August 22, 2006.
 {¶ 3} The state's evidence demonstrated that on August 29, 2005, at approximately 2:30 a.m., Cleveland Police Det. Vu Nguyen and his partner Jeffrey Cox responded to a call regarding a disturbance at defendant's home. As they approached the house, they observed through the screen door a motionless man lying on the floor a few feet from the front door. The officers repeatedly called out to the man, but he did not respond. The officers entered the home and determined that he had no pulse and that there was a bloodstain beneath him and an injury to his back. They called for EMS and a supervisor.
 {¶ 4} Defendant came downstairs and the officers asked her what had happened. Defendant stated that Williams was "faking it." They asked what had happened to his back, and defendant stated that Williams had "stabbed himself." *Page 3 
When Sgt. Rick Maruniak arrived a few minutes later, defendant started to go back upstairs and Maruniak told her to remain in the living room. He read defendant her rights and asked her to tell him what really happened. Defendant indicated that she and Williams had been divorced for approximately twelve years, but she had moved back to defendant's home two weeks earlier because he had nowhere to go, and they were just friends. On the night of the stabbing, defendant cooked dinner for her friend Annette Taylor, Williams and their daughter. Taylor had arrived at approximately 11:30 p.m., and they watched television. Taylor left at around 2:00 a.m. and Williams asked defendant why Taylor had stayed so late. Defendant reported that she told Williams that it was her house and that her friends could stay as long as they wanted. Williams became irate and pushed and struck her. While they were in the kitchen she obtained a knife and she stabbed him in the living room moments later.
 {¶ 5} Paramedics arrived a short time later and pronounced Williams dead. Deputy Coroner Joseph Felo later determined that he died of a stab wound to the thorax, which perforated his aorta and left lung and also fractured a rib. The size and nature of the wound were consistent with the knife recovered from the dishpan at defendant's home. Williams also had an abrasion on his upper lip, abrasions and incised wounds, as from fingernail scratches along his mandible, and an abraded contusion, as from a bite, on his left arm. A crack pipe and marijuana cigarette were among the items in the decedent's possession. His blood alcohol level was .08, and *Page 4 
he had cocaine in his system.
 {¶ 6} Other officers arrived on the scene at approximately 3:12 a.m. and photographed Williams, defendant and the crime scene. According to police, the house appeared tidy and orderly, and defendant was not injured, but had a small red mark on her neck. According to homicide detectives, there was evidence of an altercation in the kitchen, which dislodged the stove, and there were apparent blood stains on the adjacent wall.
 {¶ 7} Defendant spoke to Taylor on the telephone, and the officers ordered Taylor to return to the home for questioning. Taylor stated that she had not witnessed any problem or argument before the stabbing. Taylor stated that Williams asked for defendant's keys. Defendant refused because Williams was drunk, and Williams indicated that he simply needed a bedroom key to obtain his money. He then left but returned to the home a short time later. Taylor left at around 2:00 a.m., then called defendant about twenty minutes later when she reached her home. During the phone call, defendant stated that her daughter and her boyfriend were arguing. A few minutes later, defendant called Taylor back and asked her to call 9-1-1. Taylor was not sure who needed assistance. She called defendant back and defendant stated that police were already there. The trial court allowed the state to introduce Taylor's statement to police in order to show her bias in favor of defendant.
 {¶ 8} Taylor testified that several days after the incident, she learned that *Page 5 
when defendant informed her of the argument involving her daughter and the daughter's boyfriend, she was using a kind of code to convey that Williams was fighting with her and that she was in need of assistance.
 {¶ 9} Taylor denied that she and defendant were involved in a romantic relationship, but her written statement to police indicated that they had discussed the matter with Williams and that he opined that their sexual preference was no one's business. Taylor also stated that, in a subsequent discussion with defendant, she learned that the stabbing occurred after Williams threw her to the ground and tried to go up her dress. Defendant bit Williams then obtained a knife and stabbed him.
 {¶ 10} Taylor asserted that defendant would not hurt anyone. On cross-examination, she insisted that defendant had not been charged with domestic violence upon Williams in 1996.
 {¶ 11} Defendant elected to present evidence. Neighbor Ida Blackburn testified that defendant is truthful and honest. Loretta Williams[1]
likewise testified that defendant is truthful and honest. She further testified that defendant let the victim stay with her on various occasions when he had nowhere else to go.
 {¶ 12} Defendant testified that the victim had been staying with her for around three weeks prior to the incident. That morning, they had gone to the grocery store and a discount store, and Williams asked her to drive him to his uncle's home to see *Page 6 
if he could stay there. Williams appeared upset following his visit with the uncle, and defendant proceeded to cook dinner. Taylor arrived after 11:00 p.m., and the three of them watched television. Williams asked Taylor for cigarettes, then asked defendant for her keys. Defendant told Williams that she did not want him to drive her car because he was drunk, but he explained that he needed to get his money out of a locked bedroom. Williams then left for approximately twenty minutes then went upstairs to his room, and Taylor left. Defendant further testified that Williams then confronted her while she was in the bathroom, cursed at her and complained that he had been sent upstairs while defendant entertained Taylor. Defendant told him that she had done no such thing, and he then demanded his money from defendant, pushed her and went downstairs. Defendant also went downstairs and Williams continued to curse at her and began to spit in her face. Defendant told Williams that he had to move out, but she stated that she did not want to call police because there was an outstanding warrant for Williams. She called her daughter and when Taylor called, she attempted to convey to her that Williams was angry. She then called Taylor again and asked her to call 9-1-1.
 {¶ 13} Defendant further testified that the victim pushed her and she then called police, informing them that Williams had been "jumping on" her and that she needed help. She told Williams that the police were on their way and he pinned her down and put his arm around her neck. She bit him then ran to the kitchen to get a knife and returned to the living room to open the door for police. According to *Page 7 
defendant, Williams then slammed her down and started choking her. She closed her eyes and stabbed him, threw the knife in dishwater in the sink, then ran upstairs.
 {¶ 14} At the close of its case, the state dismissed the felonious assault charges, and sought an instruction on voluntary manslaughter as a lesser included offense of purposeful murder and an instruction on involuntary manslaughter as a lesser included offense of felony-murder, with aggravated assault as the underlying felony. The court also instructed the jury on the affirmative defense of self-defense. Defendant was subsequently convicted of involuntary manslaughter and sentenced to six years of imprisonment. She now appeals and assigns five errors for our review.
 {¶ 15} Defendant's first assignment of error states:
 {¶ 16} "The trial court erred in not granting Appellant's motion to suppress evidence and thus deprived Appellant [of] her rights under theFourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution."
 {¶ 17} The Fourth Amendment states that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."
 {¶ 18} The Supreme Court has consistently held that only "reasonable" searches are allowed by the Fourth Amendment, and that searches without a warrant are "per se unreasonable" except in a few well-defined and carefully *Page 8 
circumscribed instances. Katz v. United States (1967), 389 U.S. 347,357, 88 S.Ct. 507, 19 L.Ed.2d 576.
 {¶ 19} One recognized exception to the warrant requirement centers around exigent circumstances in which the safety of the police or others within a home is in peril. See United States v. Johnson (6th Cir. 1994),22 F.3d 674, 680. Exigent circumstances have been identified where there is risk of danger to police or others. Minnesota v. Olson (1990), 495 U.S. 91,110 S.Ct. 1684, 109 L.Ed.2d 85. In that case, the Court concluded that the "risk of danger to the police or to other persons inside or outside the dwelling" could constitute an exigent circumstance, but found that the exigency did not exist in that particular case. 495 U.S. at 100.
 {¶ 20} Defendant correctly notes that in Mincey v. Arizona (1978),437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290, the Supreme Court rejected a general "murder scene" exception to the warrant requirement. However, the Court held that the police have a "right" to respond to "emergency situations," and stated:
 {¶ 21} "We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. Cf. Michigan v. Tyler, supra, at 509-510. `The need to protect *Page 9 
or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" Id., quotingWayne v. United States, 115 U. S. App. D. C. 234, 241, 318 F.2d 205,212.
 {¶ 22} The scope of the exigent circumstances exception must be strictly circumscribed by the exigencies that justify the entry, and the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. State v.Sheppard (2001), 144 Ohio App.3d 135, 140-141, 759 N.E.2d 823, quotingWelsh v. Wisconsin (1984), 466 U.S. 740, 749-750, 104 S. Ct. 2091,80 L.Ed.2d 732.
 {¶ 23} An objective standard is applied to determine whether the totality of the facts and circumstances known to an officer give rise to a reasonable belief that immediate entry is necessary. See State v.Simmons, Highland App. No. 05CA4, 2006-Ohio-953, citing State v.Letsche, Ross App. 02CA2693, 2003-Ohio-6942.
 {¶ 24} In United States v. Johnson (Aug. 5, 2004), C.A. 6 No. 03-1301, 106 Fed. Appx. 363, the court held that an exigent circumstance justified the officers' warrantless entry into the house and the seizure of a shotgun where the officers were responding to a report of a man firing a shotgun in the air in a residential neighborhood, and upon their arrival, they witnessed the man fire two shots in the air and flee into the house. See, also, State v. Howard, Mahoning App. No. 06-MA-31,2007-Ohio-3170.
 {¶ 25} In the suppression hearing, the state's evidence demonstrated Det. Vu *Page 10 
Nguyen and his partner Jeffrey Cox responded to a call of "ex-husband disturbing" at 3526 East 104th Street in Cleveland. As they arrived on the scene, they could see a male lying motionless on the floor a few feet away. They called for the man, but he did not respond, and the officers became concerned for his safety. They entered the home and, as they checked the man for a pulse, they observed a bloodstain. Defendant came downstairs and the officers asked what had happened to the man. Defendant indicated that the man was "faking it." The officers turned the man over and observed a mark with blood on the man's back. Det. Cox asked defendant what happened to the man, and defendant said that he stabbed himself. Defendant attempted to go back upstairs, but the officers told her to sit on the couch. Williams was later pronounced dead and, after receiving Miranda warnings, defendant informed the officers that Williams confronted her and wanted to know why Taylor had stayed so long. The defendant reportedly told Williams that her friends were welcome to stay at her home as late as they wished. The decedent became irate and began to push and strike her. She stated that she had stabbed him, but did so after he attacked her. The officers retrieved the knife, but did not conduct a general search of the home.
 {¶ 26} From the foregoing, we cannot conclude that the trial court erred in denying defendant's motion to suppress. The warrantless entry into the home was justified because the officers were lawfully responding to defendant's call for help when they observed Williams lying on the floor unresponsive. The officers could *Page 11 
reasonably believe that it was an emergency and that Williams, and perhaps the caller, were in peril and in immediate need of aid. Upon observing the stab wound and speaking with defendant, they were authorized to retrieve the weapon in order to avoid further injury . No general search was conducted. This assignment of error is without merit.
 {¶ 27} Defendant's second assignment of error states:
 {¶ 28} "The trial court erred in not entering a judgment of acquittal regarding Appellant's conviction of involuntary manslaughter."
 {¶ 29} Within this assignment of error, defendant asserts that there is insufficient evidence to establish aggravated assault, which is the underlying offense alleged to support the offense of involuntary manslaughter. Specifically, defendant complains that there was no evidence that she acted under the sudden influence of passion or sudden rage, and there was no evidence of provocation. Rather, according to defendant, the evidence demonstrated that she acted in self-defense as she had a bona fide belief that she was in imminent danger of great bodily harm and used force only to escape such danger.
 {¶ 30} Pursuant to Crim.R. 29, a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. A Crim.R. 29(A) motion for acquittal "should be granted only where reasonable minds could not fail to find reasonable doubt." State v. *Page 12 Apanovitch (1987), 33 Ohio St.3d 19, 23, 514 N.E.2d 394; State v.Jordan, Cuyahoga App. Nos. 79469 and 79470, 2002-Ohio-590.
 {¶ 31} The standard for a Rule 29 motion is virtually identical to that employed in testing the sufficiency of the evidence. State v.Turner, Franklin App. No. 04AP-364, 2004-Ohio-6609, citing State v.Thompkins (1997), 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Thompkins, supra.
 {¶ 32} As an initial matter, we note that involuntary manslaughter, R.C. 2903.04, is a lesser included offense of felony murder, "because the only distinguishing factor is the mental state involved in the act."State v. Lynch, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185.
 {¶ 33} The essential elements of involuntary manslaughter are set forth in R.C. 2903.04 as follows:
 {¶ 34} "(A) No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony."
 {¶ 35} As to the underlying offense of aggravated assault as defined in R.C. 2903.12, this offense is an offense of "inferior degree" to the charge of felonious assault, since it includes the additional mitigating element of "serious provocation" by *Page 13 
the victim. State v. Deem (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, To be sufficient to establish "serious provocation," the evidence must show the defendant was under "extreme stress" and incited "into using deadly force."
 {¶ 36} Moreover, R.C. 2945.74 provides, in pertinent part:
 {¶ 37} "When the indictment or information charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense. * * *" See, also, Crim. R. 31(C).
 {¶ 38} In this matter, the state's evidence demonstrated that defendant and Williams had an altercation near the area of the stove, but that she claimed it occurred near the front door. Further, in the state's case, defendant's statement was read into the record and this document indicates that Williams was irate that Taylor had remained at the house so late, and "began pushing her and striking at her." She testified that she fled to the kitchen and was also able to call Taylor, her daughter, and police, but she stabbed Williams when he accosted her again. We therefore find that the trial court properly denied the motion for acquittal as to the charge of involuntary manslaughter, with aggravated assault as the predicate offense, as reasonable minds could conclude from this evidence that defendant caused the death of Williams due to serious provocation. Cf. State v. Mosley (July 13, 1995), Franklin App. No. 94APA12-170. We cannot say, however, that the evidence established self-defense as a matter of law. Rather, it was for the jury to *Page 14 
determine whether defendant's actions were the result of sudden passion or rage, or whether they were the result of fear of imminent danger of death or great bodily harm. Cf. State v. Huff, Stark App. No. 2006CA00081, 2007-Ohio-3360.
 {¶ 39} This assignment of error is overruled.
 {¶ 40} Defendant's third assignment of error states:
 {¶ 41} "The trial court erred in not granting Appellant's motion for a new trial based upon the trial court's erroneous jury instruction of involuntary manslaughter."
 {¶ 42} Defendant next asserts that the jury was erroneously instructed regarding the aggravated assault portion of the involuntary manslaughter instruction. Specifically, defendant asserts that the instruction was confusing and failed to provide a proper allocation of the burden of proof.
 {¶ 43} In State v. Schofield (Feb.4, 1994), Lucas App. No. L-93-008, the court noted:
 {¶ 44} "[U]nder the dictates of Rhodes, supra [State v. Rhodes (1992),63 Ohio St.3d 613, 617, 590 N.E.2d 261] it necessarily follows that, where a defendant is charged with felonious assault and sufficient evidence of provocation is presented, the trial court should instruct the jury that the defendant carries the burden of proving such mitigating circumstances, by a preponderance of the evidence in order for the defendant to be convicted of aggravated assault rather than felonious assault. See, also, 4 Ohio Jury Instructions (1992), Sections503.11(13) and 503.12." *Page 15 
 {¶ 45} Accord State v. Castle, Logan App. No. 8-06-27, 2007-Ohio-3599.
 {¶ 46} The record indicates that the jury was not instructed in this matter that the defendant carried the burden of proving provocation by a preponderance of the evidence. The jury was instructed that the state had to prove the offense of involuntary manslaughter beyond a reasonable doubt, and the offense of aggravated assault was then defined as:
 {¶ 47} "When a person knowingly causes serious physical harm to another while under the influence of sudden passion or in a sudden fit of rage either of which was brought on by a serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force." This court can discern no prejudice from the instruction, however, as the instruction as given placed the entire burden of proof on the state, noted that it was beyond a reasonable doubt; and no burden was placed upon defendant. State v.Allen (Oct. 20, 1981), Franklin App. No. 81AP-448.
 {¶ 48} Defendant's fourth assignment of error states:
 {¶ 49} "The jury verdict was against the manifest weight of the evidence."
 {¶ 50} In State v. Thompkins, supra, the court illuminated its test for manifest weight of the evidence as follows:
 {¶ 51} "Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will *Page 16 
be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." Black's [Law Dictionary (6 Ed.1990)], at 1594."
 {¶ 52} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ""thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Id., citingTibbs v. Florida (1982), 457 U.S. 31, 45, 102 S. Ct. 2211, 2220,72 L.Ed.2d 652, 663. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717,720-721.
 {¶ 53} In this matter, the state's evidence established that Williams and defendant spent the day together and had no problems earlier in the day. Defendant prepared food and left it in the kitchen. Taylor came over to watch television, and Williams ran a brief errand then returned and went upstairs. The evidence also demonstrated that there was an altercation near the stove and that there is a blood stain nearby. Defendant obtained a knife from the kitchen and, following the altercation, Williams died from a stab wound to the back. Defendant contended that *Page 17 
Williams accosted her, slammed her down and put his arm around her neck. She bit him then ran to the kitchen to get a knife and returned to the living room to open the door for police. According to defendant, Williams then slammed her down and started choking her. There were no signs of an altercation in this portion of the house however, and defendant was able to make various phone calls and reported no injuries. Williams had various lacerations and abrasions. From the foregoing, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice in convicting defendant of involuntary manslaughter with the predicate offense of aggravated assault.
 {¶ 54} Defendant's fifth assignment of error states:
 {¶ 55} "The trial court erred in not allowing the Appellant to testify as to admissible evidence offered in support of her defense of self-defense, and this denied her due process and a fair trial under the United States and Ohio Constitutions."
 {¶ 56} Within this assignment of error, defendant complains that the trial court erred in refusing to permit her to introduce into evidence Williams' out-of-court statements to her at the time of the altercation.
 {¶ 57} As to our standard of review, we note that a trial court enjoys broad discretion in the admission and exclusion of evidence and will not be reversed absent a clear abuse of discretion which materially prejudiced the objecting party. Barbeck v. Twinsburg Twp. Bd. ofTrustees (1992), 73 Ohio App.3d 587, 592, *Page 18 597 N.E.2d 1204.
 {¶ 58} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is generally inadmissible unless the evidence falls within one of the recognized exceptions. Evid.R. 802.
 {¶ 59} Defendant insists that Williams' out-of-court statements to her during the altercation were not offered for the truth of the matter asserted but rather to explain defendant's actions. We cannot agree, as the statements were intended to prove the facts as she related them. No exception to the hearsay rule was argued or noted on appeal. Moreover, although the specific statements were not permitted, the court permitted the defense to describe Williams' conduct, tone and demeanor, and we find that the record as a whole amply conveyed the situation, defendant's beliefs about her safety, and the events preceding the use of force.
 {¶ 60} This assignment of error is without merit.
Affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence. *Page 19 
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., A.J., and MARY EILEEN KILBANE, J., CONCUR
[1] Loretta Williams testified that she is not related to any party in this proceeding. *Page 1