**The STATE of Ohio, Appellant,**

**v.**

**MINEAR, Appellee.**

[Cite as *State v. Minear*, 191 Ohio App.3d 774, 2010-Ohio-6577.]

Court of Appeals of Ohio,
Eleventh District, Portage County.

No. 2010–P–0025.

Decided Dec. 30, 2010.

Victor V. Vigluicci, Portage County Prosecuting Attorney, and Pamela J. Holder, Assistant Prosecuting Attorney, for appellant.

Timothy J. Hart, for appellee.

CYNTHIA WESTCOTT RICE, Judge.

{¶ 1} Appellant, the state of Ohio, appeals the judgment of the Portage County Municipal Court, Ravenna Division, granting appellee Jeffrey B. Minear's motion to suppress. At issue is whether such exigent circumstances existed that the police were authorized to enter his home without a search warrant. For the reasons that follow, we reverse and remand.

{¶ 2} On October 5, 2009, appellee was charged with operating a motor vehicle while under the influence of alcohol ("OVI"), in violation of R.C. 4511.191(A)(1)(a) and (h); speeding, in violation of R.C. 4511.21(A); and failure to stop after an accident, in violation of R.C. 4549.02. The charges arose from a hit-skip crash in

which appellee rear-ended another vehicle and left the scene before police arrived.

{¶ 3} Appellee pleaded not guilty and filed a motion to suppress evidence. The court subsequently held a suppression hearing. Patrolman Jon Hurley and Sergeant Troy Beaver of the Streetsboro Police Department testified for the state. Appellee did not testify or present any evidence in opposition. The officers' testimony was therefore undisputed.

{¶ 4} Officer Hurley testified that on October 2, 2009, at approximately 4:30 p.m., he was dispatched to the exit ramp off Interstate 480 at Frost Road on a call of a traffic crash.

{¶ 5} On arrival, he spoke to a Mr. Geib, who reported that while he was driving on the exit ramp, a gray Volkswagen struck his vehicle from behind. Geib's vehicle had sustained damage to the right rear bumper as a result of the impact. He said that the driver of the Volkswagen had exited his vehicle and appeared to have been drinking alcohol. He briefly showed Geib his driver's license, but then left the scene before Geib could get the driver's information and before the police arrived. However, Geib took down the driver's license-plate number.

{¶ 6} Geib gave Hurley a description of the driver and his vehicle, and told the officer that the man had said he lived just down the road. Geib also provided the officer with the man's license-plate number. The information provided by dispatch from the license plate, including the description of the vehicle and its registered owner, matched the information provided by Geib. The other driver was identified as appellee. His address was listed as the Woodland Apartments, 833 Frost Road, Apartment 502, which, as appellee had told Geib, was just down the road from the crash scene.

{¶ 7} Hurley proceeded to investigate. He went to appellee's apartment complex to question him concerning his involvement. He also called dispatch and requested that Sergeant Troy Beaver respond to provide assistance.

{¶ 8} Hurley located appellee's Volkswagen in the parking lot. He saw that the front left bumper had sustained damage that was consistent with Geib's report. Appellee's vehicle had sustained damage that was more serious than that sustained by Geib's vehicle. Hurley said that he believed appellee's vehicle had sustained a greater impact, increasing the likelihood that he had been injured in the crash.

{¶ 9} Sergeant Beaver testified that he met Hurley in the parking lot. Hurley advised him of the status of the investigation and pointed out the damage to appellee's vehicle. The officers then approached appellee's apartment and knocked on the door. They knocked and pounded for several minutes with no

response. Beaver testified that they were concerned that something might have been wrong with appellee because the crash had just occurred, and although they believed he was in his apartment, he was not answering the door. As a result, Beaver asked dispatch to call the manager and ask him to respond so they could check on appellee's welfare.

{¶ 10} Hurley testified that he then began to knock on the windows on both sides of the front door. As he was knocking on the left window, he saw a male body lying motionless, face down, inside the apartment between the living room and the hallway. While they were pounding on the windows, the body did not move. Hurley could not tell whether the man was unconscious or injured. The officers had knocked on the door and windows for ten minutes before Hurley saw the body.

{¶ 11} Hurley said to Beaver, "There's a body there. * * * They're not * * * moving. We need to get in." Hurley said that as soon as he saw the body lying on the floor, he told Beaver about it, called the information in to dispatch; and requested that emergency medical personnel be dispatched to the scene.

{¶ 12} Beaver testified that he saw the lower half of a body lying face down in the living room. He said there was no indication that the man was simply asleep. He said, "[T]he person was unresponsive * * *. We knocked loud enough and long enough and hard enough where a person simply sleeping would have been alert, and clearly they were lying face down and, in my opinion, in duress and in need of attention * * *."

{¶ 13} Although the manager had not yet arrived at the scene, Beaver told Hurley to knock down the door, and he did so. Hurley said the officers then entered the apartment to check on the man's welfare. They tried to get a response from him by saying, "Hey, hey," grabbing his shoulder and leg, and shaking him. Finally, after about one minute, the man, later identified as appellee, awoke. He appeared intoxicated. A strong odor of alcohol emanated from his person. His speech was slurred. He had bloodshot eyes. He had urinated on himself.

{¶ 14} Appellee kept saying, "What are you doing in my house?" The officers said that his car had been involved in a crash, he was not answering the door, and they were here to check on him. Appellee said that he had not been involved in a crash. A few minutes later, emergency medical personnel arrived. The paramedics walked appellee to the couch. He was unsteady and stumbling. Appellee's subsequent breathalyzer-test result was .222, nearly three times the legal limit.

{¶ 15} Following the hearing, the trial court sustained appellee's motion to suppress. In support of its ruling, the trial court made the following finding:

"The Court on these circumstances and facts finds no exigent facts or circumstances that would justify such an entry. There was no evidence of injury or emergency which would be necessary to protect an injured occupant." The state appeals the trial court's ruling, asserting the following for its sole assignment of error:

{¶ 16} "A de novo review of the law on exigent circumstances and the emergency aid exception to the warrant requirement using factual findings that are supported by competent and credible evidence in the record demonstrates that the trial court erroneously granted Minear's motion to suppress."

{¶ 17} The state argues that the trial court erred in granting appellee's motion to suppress because the evidence supported a finding of exigent circumstances, making a search warrant unnecessary, based on the officers' reasonable belief that a man inside appellee's apartment was in need of emergency aid.

{¶ 18} "On review of a trial court's ruling on a motion to suppress, an appellate court determines whether the trial court's findings are supported by some competent, credible evidence." *Bainbridge v. Kaseda,* 11th Dist. No. 2007–G–2797, 2008-Ohio-2136, 2008 WL 1934491, at ¶ 20. When the trial court's findings of fact are supported by competent, credible evidence, the appellate court is required to accept the trial court's factual findings as true. Id. The reviewing court then determines, without deference to the trial court, whether the applicable legal standard has been met. Id.; *State v. Jackson,* 11th Dist. No. 2003–A–2005, 2004-Ohio-2920, 2004 WL 1238392, at ¶ 12.

{¶ 19} Accordingly, a reviewing court must defer to the trial court's factual findings only if they are supported by competent, credible evidence. *State v. Long* (1998), 127 Ohio App.3d 328, 332, 713 N.E.2d 1. We review determinations of facts only for clear error. *State v. Gillard* (1997), 78 Ohio St.3d 548, 552, 679 N.E.2d 276. " 'A finding is "clearly erroneous" when * * * the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *State v. Prigmore,* 5th Dist. No. 2005–CA–00115, 2005-Ohio-6952, 2005 WL 3547949, at ¶ 15, quoting *United States v. United States Gypsum Co.* (1948), 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.

{¶ 20} The Fourth Amendment to the United States Constitution and Section 14, Article 1 of the Ohio Constitution require police to obtain a search warrant based on probable cause prior to conducting a search unless the search falls within an exception to this requirement. *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576; see also *State v. Totten* (Feb. 15, 2001), 10th Dist. No. 00AP–535, 2001 WL 125153.

{¶ 21} "Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' *Agnello v. United States*

[(1925)], 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145, for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer * * * be interposed between the citizen and the police * * *.' *Wong Sun v. United States* [(1963)], 371 U.S. 471, 481–482, 83 S.Ct. 407, 414, 9 L.Ed.2d 441. 'Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes,' *United States v. Jeffers* [(1951)], 342 U.S. 48, 51, 72 S.Ct. 93–95, 96 L.Ed. 59, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz* at 357.

{¶ 22} In *State v. Stanberry*, 11th Dist. No. 2002–L–028, 2003-Ohio-5700, 2003 WL 22427922, this court held:

{¶ 23} "The doctrine of exigency is an exception to the general, constitutional prohibition against warrantless searches. 'Exigency' denotes the existence of 'real immediate and serious consequences' that would certainly occur were a police officer to postpone action to get a warrant. *Welsh v. Wisconsin* (1984), 466 U.S. 740, 751, 104 S.Ct. 2091, 80 L.Ed.2d 732. As such, a court will not 'excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.' *McDonald v. United States* (1948), 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153.

{¶ 24} "The United States Supreme Court has held that the doctrine of exigency applies in two separate sets of circumstances: first, police may commence a warrantless search and seizure to avoid 'the imminent destruction of vital evidence.' *Wong Sun v. United States* (1963), 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441. Second, a warrant is unnecessary where the police are faced with a 'need to protect or preserve life or avoid serious injury.' *Mincey v. Arizona* (1978), 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290." *Stanberry*, 2003-Ohio-5700, 2003 WL 22427922, at ¶ 14–15.

{¶ 25} In *Mincey*, 437 U.S. at 392, 98 S.Ct. 2408, 57 L.Ed.2d 290, the United States Supreme Court stated:

{¶ 26} "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. * * * 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' "

{¶ 27} For example, in *State v. Bugaj*, 7th Dist. No. 06–BE–27, 2007-Ohio-967, 2007 WL 678480, the court held that exigent circumstances existed when the officer saw a man lying face down on the floor and not moving. Id. at ¶ 22. The

court stated: "Because Deputy Stoffer did not know whether the man on the floor was dead or alive, whether he had suffered a drug overdose, or whether he had another medical problem, * * * exigent circumstances existed for Deputy Stoffer to enter the apartment." Id.

{¶ 28} In *State v. Williams*, 8th Dist. No. 88873, 2007-Ohio-4845, 2007 WL 2729798, police officers responded to a call from the defendant regarding a disturbance at her home. As they approached the house, they observed through the screen door a motionless man lying on the floor a few feet from the front door. The officers repeatedly called out to the man, but he did not respond. The officers then entered the home. In affirming the trial court's denial of defendant's motion to suppress, the Eighth District held: "The warrantless entry into the home was justified because the officers were lawfully responding to defendant's call for help when they observed [her ex-husband] lying on the floor unresponsive. The officers could reasonably believe that it was an emergency and that [he was] in peril and in immediate need of aid." Id. at ¶ 26.

{¶ 29} Turning to the facts of the instant case, when Hurley arrived at the scene of the crash, he learned that appellee had just rear-ended Geib's vehicle, that appellee had appeared to be under the influence of alcohol, and that he had left the scene before police arrived. Geib had taken down his license number, which allowed police to obtain appellee's information.

{¶ 30} Shortly after appellee left the crash scene, Hurley located appellee's vehicle in the parking lot of his apartment complex. It had sustained damage to its front bumper, which, according to Hurley, was serious enough to cause him to be concerned that appellee might have been injured.

{¶ 31} Although both officers loudly knocked and pounded on appellee's door for several minutes, he did not respond, although, with his vehicle in the parking lot, the officers believed that he was in his apartment. Appellee's failure to respond in these circumstances caused the officers to be concerned for his well-being. Sergeant Beaver then asked dispatch to call the manager to ask him to respond to the apartment to assist the officers in checking on appellee's welfare.

{¶ 32} Thereafter, Hurley started knocking on the window next to the door, and while doing so, he saw a male body lying face down between the living room and the hallway. Despite the long and loud banging on the door and windows, the body remained motionless. While still outside, Hurley immediately called dispatch and requested that emergency medical personnel be sent. Beaver said that in the circumstances, it did not appear that the man was sleeping, but rather, that he was in distress and needed medical attention. Then, on Beaver's instruction, Hurley broke down the door, and the officers entered appellee's apartment to check on appellee's welfare.

{¶ 33} The foregoing undisputed evidence supported a finding that the officers were faced with exigent circumstances that justified their entry into appellee's apartment without a search warrant.

{¶ 34} We note that several factual findings of the trial court were not supported by and in fact were contradicted by the foregoing undisputed evidence. Specifically, the court incorrectly found: (1) "Sergeant Beaver * * * learned that the drivers had exchanged information * * * at the scene" (Geib did not obtain appellee's information from him. Instead, he took down appellee's license plate number, and this is how the officers obtained appellee's information); (2) "The officers, through dispatch, attempted to contact a manager of the complex * * * to obtain a key, but were not successful" (the officers knocked on the door before they asked dispatch to call the manager, and there was no evidence that they attempted to obtain a key); (3) "Having received no answer from the manager of the units, the officers pounded on the door * * * and got no response" (the officers had not yet called for the manager before they started knocking on the door); and (4) "Upon entry, * * * [t]hey saw no injuries or evidence of any injury" (appellee was found lying face down, motionless, and unresponsive). Because these findings are not supported by the evidence, they are clearly erroneous and are not entitled to any deference on appeal.

■ {¶ 35} Appellee argued below that the officers' true intent was to arrest him, rather than to provide medical attention. However, it is well settled that as long as the circumstances justify the officers' actions, their subjective intent is irrelevant. In *Brigham City, Utah v. Stuart* (2006), 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650, the United States Supreme Court stated:

■ {¶ 36} "[L]aw enforcement officers may enter a home without a warrant *to render emergency assistance to an injured occupant* or to protect an occupant from imminent injury.

{¶ 37} " * * *

■ {¶ 38} "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.' * * * The officer's subjective motivation is irrelevant. * * * It therefore does not matter * * * whether the officers entered the kitchen to arrest respondents and gather evidence against them or to assist the injured and prevent further violence." (Emphasis added.) Id. at 403–405, 126 S.Ct. 1943, 164 L.Ed.2d 650.

{¶ 39} The circumstances presented here, when viewed objectively, justified the officers' actions. As a result, their subjective motivation is irrelevant.

{¶ 40} Appellee argues on appeal that the officers were not justified in entering his apartment because any reasonable person finding him lying unresponsive on the floor would conclude that he was merely sleeping. However, Sergeant Beaver's undisputed testimony defeats this argument. He stated that the officers knocked "loud enough and long enough and hard enough" that any person who was simply sleeping would have been awakened. He also said that the lower part of the body was lying face down on the floor in the living room. Based on the foregoing, Beaver testified that he believed that the man was in distress and in need of attention. In light of the evidence presented, this belief was reasonable. In these circumstances, if the officers had failed to secure immediate aid for appellee, they may well have been defending a claim that they were derelict in their duty.

{¶ 41} Contrary to appellee's argument, we agree with the holding of the Seventh District in *Bugaj*, 2007-Ohio-967, 2007 WL 678480, and *Williams*, 2007-Ohio-4845, 2007 WL 2729798, that exigent circumstances exist when police see an adult lying on the floor motionless and unresponsive. We note that appellee has failed to cite any authority for the proposition that under such facts, exigent circumstances do not exist.

{¶ 42} The dissent maintains that the "pivotal fact" that renders the officers' entry unlawful is their decision to call for the manager before they discovered the body. However, as noted above, the officers' subjective intent is irrelevant to the analysis.

{¶ 43} In *Michigan v. Fisher* (2009), —— U.S. ——, 130 S.Ct. 546, 175 L.Ed.2d 410, the Supreme Court held: "This 'emergency aid exception' does not depend on the officers' subjective intent * * * when the emergency arises. * * * It requires only 'an objectively reasonable basis for believing,' * * * that 'a person within [the house] is in need of immediate aid.' * * *." Id., —— U.S. ——, 130 S.Ct. at 548, 175 L.Ed.2d 410. In upholding the warrantless entry in that case, the court noted that the officers observed the emergency *before the entry*. Id., —— U.S. ——, 130 S.Ct. at 547, 175 L.Ed.2d 410. The court held that "the officer's *entry* was reasonable under the Fourth Amendment." (Emphasis added.) Id., —— U.S. ——, 130 S.Ct. at 549, 175 L.Ed.2d 410.

{¶ 44} Further, the Supreme Court in *Brigham City*, 547 U.S. at 404, 126 S.Ct. 1943, 164 L.Ed.2d 650, held: " * * * An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.' * * * The officer's subjective motivation is irrelevant." (Emphasis omitted.) Id. Noting that the officers saw a fight taking place in the kitchen and one man being punched, the court held that it was reasonable for the officers to *enter* the house because they

had an objectively reasonable basis for believing that the victim "might need help" and that the violence was only beginning.

{¶ 45} Based on the foregoing, it is the officers' *entry* into the apartment, not their previous *decision to call for the manager,* that must be justified. The officers' decision to call for the manager does not have Fourth Amendment implications because the officers did not enter the apartment at that time. The officers' subjective motivation in entering the apartment is irrelevant.

{¶ 46} The "pivotal fact" was, therefore, not what the officers knew when they decided to call for the manager, but rather, what they had seen when they entered the apartment. In fact, once they saw the body, the officers decided not to wait for the manager; instead, they immediately called emergency medical personnel and entered the apartment.

{¶ 47} Therefore, because it is the entry, not the decision to call for the manager, that is relevant, and because the officers saw the body before they entered, the officers did not rely on hindsight to support their entry, as the dissent asserts.

{¶ 48} Next, we do not agree with the dissent's argument that the officers were not faced with an emergency. The Supreme Court in *Fisher,* —— U.S. ——, 130 S.Ct. 546, 175 L.Ed.2d 410, held: "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception. * * * [T]he test * * * [is] whether there was 'an objectively reasonable basis for believing' that medical attention was needed * * *." Id., —— U.S. ——, 130 S.Ct. at 549, 175 L.Ed.2d 410. Thus, in order for police to invoke the exception, they need have only a reasonable basis to believe the occupant is in need of medical attention. As noted above, the fact that the officers saw the body lying face down, motionless, and unresponsive justified their belief that appellee needed medical attention and was sufficient to invoke the emergency-aid exception. *Bugaj,* 2007-Ohio-967, 2007 WL 678480; *Williams,* 2007-Ohio-4845, 2007 WL 2729798.

{¶ 49} Finally, the dissent suggests that even if the officers had been entitled to enter appellee's apartment to render emergency assistance, their observations of his inebriated condition were subject to exclusion due to their previous decision to call for the manager. However, the case cited by the dissent does not support this argument. In *Georgia v. Randolph* (2006), 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208, the Supreme Court stated: "And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause * * *." Id. at 118. Here, appellant was obviously in "plain view" because the officers were entitled to enter his apartment without a warrant based on

objectively reasonable exigent circumstances. As a result, testimony regarding their observations of his condition would not be subject to exclusion.

{¶ 50} We therefore hold that the trial court erred in granting appellee's motion to suppress evidence.

{¶ 51} For the reasons stated in the opinion of this court, it is the judgment and order of this court that the judgment of the Portage County Municipal Court, Ravenna Division, is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

Judgment reversed<br>and cause remanded.

CANNON, J., concurs.

TRAPP, P.J., dissents.

MARY JANE TRAPP, Presiding Judge, dissenting.

{¶ 52} The pivotal fact in this case, and to our analysis, should be that even before the officers noticed Jeffrey Minear lying face down in the hallway, they had made a decision to make a warrantless entry. Without any indication of any type of emergency or even the knowledge that he was home at the time, the property manager was called to open the unit "in order to speak to the driver." Thus, I have no choice but to respectfully dissent.

{¶ 53} During the suppression hearing, the patrolman testified that he arrived at the apartment and knocked on the door "so he could talk to the owner of the vehicle and see * * * what involvement happened." He further testified, "[I] kept knocking on the door several times. Began to knock on the windows. At that time [his sergeant] arrived on scene. He also knocked a couple of times. He made a decision to contact dispatch and see if we could get management * * * to come to the scene *to see as far as getting in* to see if we could talk to the person who was driving the vehicle." (Emphasis added.) "After—while we were waiting for that person, dispatch said it would be about five minutes. While we were waiting for management to show up, that's when I stepped over to the left to look in the window and saw the body and knocked on the window and no response. Called dispatch again, and at this time have E.M.S. dispatched to the scene."

{¶ 54} The sergeant testified that "nothing stood out about the apartment itself," and the officers were on the scene for ten minutes before they observed the body through the window.

{¶ 55} In these "exigent-circumstances" or "emergency-aid-exception" cases, there must be an objective inquiry into the circumstances leading up to the

decision to make a warrantless entry. The United States Supreme Court, in *Michigan v. Fisher* (2009), —— U.S. ——, 130 S.Ct. 546, 175 L.Ed.2d 410, recently reexamined this line of cases, including *Mincey v. Arizona* (1978), 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290, and *Brigham City v. Stuart* (2006), 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650. It is apparent from the trial court's written opinion in this case that it, too, considered these cases before ruling on the motion to suppress.

{¶ 56} In *Fisher,* the police officers were responding to a disturbance complaint and were directed to a residence where a man was "going crazy." Upon arrival, they found a smashed pick-up truck, damaged fence posts, broken windows, and blood on the truck hood and on the clothing inside the truck. Through a window, they saw the defendant throwing things and screaming; he refused to answer the door. When the officers pushed the door partly open, they saw the defendant pointing a long gun at them.

{¶ 57} The majority in *Fisher,* in a rare fact-based decision, reversed the state court, citing the exigency identified in *Brigham City,* 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650, i.e., "the need to assist persons who are seriously injured or threatened with such injury." *Fisher,* —— U.S. ——, 130 S.Ct. at 548, 175 L.Ed.2d 410. It noted that the emergency-aid exception does not depend on the subjective intent of the police officers or the seriousness of the crime being investigated. Rather, "[i]t requires only 'an objectively reasonable basis for believing' * * * that 'a person within [the house] is in need of immediate aid.'" Id.

{¶ 58} The objective facts presented to the police officers in *Fisher* and in *Brigham before* they made a decision to enter a private residence without a warrant were quite similar and striking: a report of a disturbance, signs of injury, and sounds of ongoing violent or threatening behavior.

{¶ 59} There were no such objective compelling facts in this case, and I find that there was competent, credible evidence supporting the factual findings of the trial court that on these facts, no exigent circumstances justified the decision to call the property manager to gain entry. When the officers made this decision, there was simply no evidence of an injury or an emergency before them.

{¶ 60} The question is what emergency was confronting the officers when the decision was made to call the manager to gain entry? Indeed, the driver of the first vehicle had told the officer at the scene that both drivers were uninjured. The officer was aware of Minear's address, arrived at the address, and found the suspect's vehicle. There was "minimal to moderate damage" to both cars. When repeated knocking on the suspect's door and windows "a good half a dozen to ten times" provoked no response, and knowing that a possibly impaired driver was now off the road, the officers could have returned after securing a warrant. But

the decision was made to call the manager and wait for the manager to arrive in order to make a warrantless entry. It was only while waiting for another ten minutes to gain entry that the officer then observed Minear lying face down on the floor.

{¶ 61} As *Fisher* explained, it is not what the officer believed, but whether there was "an objectively reasonable basis for believing" that "someone was in need of medical assistance or in danger" when the decision was made to summon the manager to gain entry. Just as the court found that "[i]t was error for the Michigan Court of Appeals to replace that objective inquiry into appearances with its hindsight determination that there was in fact no emergency," *Fisher*, —— U.S. ——, 130 S.Ct. at 549, 175 L.Ed.2d 410, the corollary is also true. It would be error to replace objective inquiry into appearances with both the officers' and this majority's hindsight determination that the decision to enter without securing a warrant made before the officer saw a person on the floor was excused because he did see a person on the floor and rightly made the decision to force entry to check on the person.

{¶ 62} During oral argument, the state asserted that if the trial court's decision stands, a police officer seeing a body lying face down on a floor will be caught in a "Catch–22": enter to offer aid and then later have a trial court suppress any evidence found after the warrantless entry and further face a tort claim because of the warrantless entry, or not enter to offer aid and then face a tort claim for not coming to the aid of an injured person.

{¶ 63} First " '[i]t would be silly to suggest that the police would commit a tort by entering * * * to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur.' " *Brigham City*, 547 U.S. at 403–404, 126 S.Ct. 1943, 164 L.Ed.2d 650, quoting *Georgia v. Randolph* (2006), 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208. Second, officers will, of course, come to the aid of a possibly injured person and worry about the suppression hearing later. The prosecutors will then just have to rely on other evidence to make the state's case. Here, the state had the testimony of the other driver that it appeared to him that Minear had been drinking; that Minear had suggested to the other driver that they go back to his place to "smoke a bowl and talk about this incident;" and that Minear caused an accident. Such evidence is not optimal for a prosecution for operating a motor vehicle while intoxicated, but cases have been successfully made on such evidence.

{¶ 64} The fact that Minear was found lying face down, passed out on the floor, after the decision was made to enter without a warrant cannot retroactively justify this decision made without any basis grounded in any of the exceptions to the Fourth Amendment's prohibition against the warrantless entry into one's home. The trial judge in this case who heard the officers' testimony was not

convinced that they had an objectively reasonable basis for believing that an emergency existed at the time the decision was made to gain entry, and as the dissenters in *Fisher* wrote, "[w]e ought not usurp the role of the factfinder when faced with a close question of the reasonableness of an officer's actions." *Fisher*, —— U.S. ——, 130 S.Ct. at 551, 175 L.Ed.2d 410.